[Cite as *State v. Garrett*, 2026-Ohio-49.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240463 |
| | | TRIAL NO. B-2302016 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| NOLAN GARRETT, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 1/9/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Garrett*, 2026-Ohio-49.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                    :         APPEAL NO.    C-240463
                                            TRIAL NO.     B-2302016
    Plaintiff-Appellee,      :

  vs.                            :
                                                  *O P I N I O N*
NOLAN GARRETT,                    :

    Defendant-Appellant.     :



Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: January 9, 2026


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Joshua A. Thompson*, Assistant Public Defender, for Defendant-Appellant.

CROUSE, **Judge**.

**{¶1}** Defendant-appellant Nolan Garrett was convicted, following a bench trial, of murder and having a weapon while under a disability. Garrett now appeals that conviction and challenges (1) the constitutionality of his weapons-under-disability conviction under the Second Amendment, (2) the trial court's refusal to grant his motion to compel review of police files, (3) the admission of alleged hearsay evidence, (4) the sufficiency of the State's evidence of venue, and (5) the weight of the evidence proving his guilt. For the reasons set forth below, we affirm the trial court's judgment of conviction.

## I. BACKGROUND

**{¶2}** On the morning of May 1, 2023, the victim in this case, K.H., was shot and killed near a Taco Bell across the street from an apartment building on Highland Avenue in Cincinnati, Ohio.

**{¶3}** Nine days later, the grand jury returned a six-count indictment against Garrett. Counts 1 and 2 were for murder and felony murder, violations of R.C. 2903.02(A) and (B). Count 3 charged Garrett with felonious assault in violation of R.C. 2903.11(A)(1). Counts 4 and 5 charged Garrett with having a weapon while under disabilities in violation of R.C. 2923.13(A)(2) and (3), based on Garrett's prior felony convictions for a violent offense and a drug offense, respectively. And Count 6 charged tampering with evidence in violation of R.C. 2921.12(A)(1). The first three counts (the murder charges and the felonious-assault charge) carried gun specifications.

### A. Pretrial Proceedings

**{¶4}** In February 2024, two weeks before trial, the State revealed that the Cincinnati Police Department ("CPD") had found nine-month-old recordings of

witness interviews that had never been disclosed to Garrett. The State and CPD maintained that this omission was merely an oversight. Nevertheless, in response to this revelation, Garrett moved the court to order (1) CPD to turn over its entire file to the prosecutor's office, (2) the prosecutors to review the file to ensure it contained no additional material to which Garrett was entitled, and (3) both parties to certify that they had done so. The trial court denied Garrett's motion but continued the trial to allow Garrett to follow up on information discovered in these recordings.

{¶5} Garrett later filed a motion to dismiss the two weapons-under-disability charges, arguing that the charges violated the Second Amendment to the United States Constitution and Article I, Section 4, of the Ohio Constitution. After briefing and a hearing, the trial court denied the motion.

### B. Trial & Conviction

{¶6} Garrett's case was ultimately tried to the bench. The State's theory, based upon the testimony of its witnesses, centered on a love triangle between Garrett, L.R., and K.H. The State suggested that animosity between K.H. and Garrett prompted the fight that led to K.H.'s death. Garrett's defense was one of mistaken identity. He argued that that the State failed to prove he was the man who shot K.H.

{¶7} At trial, the State adduced testimony that K.H. and L.R. had been in an on-and-off relationship. At the time of the murder, however, K.H. and L.R. were in an "off" stretch, and L.R. had begun seeing Garrett. On the night prior to the shooting, Garett and L.R. had slept at an apartment building on Highland Avenue, in an apartment that belonged to one of L.R.'s friends. In the morning, K.H. arrived to give L.R. money for rent on a different apartment the two had shared. During his stop at the Highland Avenue apartment, however, K.H. got into a physical altercation with Garrett. K.H. fled from the apartment and onto the street and Garrett pursued.

{¶8}  The testimony about what happened next was somewhat confused. Some witnesses suggested that K.H. and Garrett engaged in a second round of fighting outside, while others described only pursuit. But all accounts agreed that the man identified as Garrett ultimately shot K.H. multiple times, and that K.H. fell to the ground within sight of the Taco Bell across the street from the Highland Avenue apartment building. After the shooting, testimony suggested, Garrett rushed back into the apartment, grabbed his keys, and left. K.H. died from his wounds.

{¶9}  Of the ten witnesses in the State's case in chief, five testified that they had been present for the shooting or the events surrounding it, including L.R., a second individual who had been present in the apartment from which K.H. had fled, a Taco Bell employee who testified to witnessing the shooting from between 15 and 20 feet away, and two HVAC technicians who witnessed the incident from a distance of roughly 200 feet. The State's remaining five witnesses included two CPD officers, the coroner, and two other forensic experts.

{¶10}  Both the Taco Bell employee and one of the HVAC technicians identified Garrett in open court as the man they saw shoot K.H. The second HVAC technician was not asked to do so.

{¶11}  At the close of the State's case, Garrett moved for an acquittal under Crim.R. 29, arguing mainly that the State had failed to prove venue. The trial court denied this motion, based in part on the trial court's participation in a "bench view" at an earlier point in the trial, during which the court had visited the murder scene in person.

{¶12}  Following closing arguments, the trial court found Garrett guilty on all but the evidence-tampering charge. In explaining its findings, the court credited and gave great weight to the testimony of the Taco Bell employee. The court gave little

weight to the HVAC workers' testimony, and it credited parts of L.R.'s testimony while expressing skepticism about others. Ultimately, the trial court accepted L.R.'s testimony that she had seen Garrett fleeing the murder in a white tank top, as this was corroborated by surveillance footage and the testimony of the Taco Bell employee.

{¶13} The trial court found Garrett guilty beyond a reasonable doubt of murder, felony murder, felonious assault, and having weapons while under a disability (Counts 1 through 5). The court acquitted Garrett of the charge that he had tampered with evidence by disposing of the gun used to kill K.H. (Count 6). It found that, even though "the police never found the gun," there was "no evidence that Mr. Garrett was the one that made the gun unavailable."

{¶14} At sentencing, the trial court merged Counts 2 and 3 (felony murder and felonious assault) into Count 1 (murder), and sentenced Garrett to prison for 15 years to life on that count. The trial court also merged the two weapons-under-disability counts, so that Count 5 (based on Garrett's prior drug felony) merged into Count 4 (based on his prior violent felony), and imposed a consecutive, 3-year prison term on Count 4. Finally, the court imposed two more consecutive 3-year prison terms for the firearm specifications to Counts 1 and 2, which it did not merge.[1] In total, Garrett was sentenced to a cumulative term of 24 years to life in prison. Garrett then filed this timely appeal.

## II. ANALYSIS

{¶15} In his brief, Garrett raises five assignments of error, alleging errors both before and during his trial:

---

[1] The trial court never said what happened to the third firearm specification, which had been charged under Count 3. In its entry, the court neither merged this specification into the others, nor imposed another prison term. Neither party has challenged Garrett's sentence, however, so we have no occasion to address it.

**First Assignment of Error:** The trial court erred in denying Mr. Garrett's motion to dismiss both of his having weapons while under disability charges.

**Second Assignment of Error:** The trial court abused its discretion in denying Mr. Garrett's motion to compel the Cincinnati Police to produce their complete file for review.

**Third Assignment of Error:** The trial court abused its discretion by allowing the State to present improper hearsay evidence in violation of Evid.R. 801(C), *State v. Montgomery*, 2016-Ohio-5487, and *State v. Ricks*, 2013-Ohio-3712.

**Fourth Assignment of Error:** The State failed to produce sufficient evidence of venue.

**Fifth Assignment of Error:** Mr. Garrett's convictions for murder, felonious assault, their respective specifications, and having weapons while under disability, were against the manifest weight of the evidence.

We review each of these assignments of error in turn.

### A. Motion to Dismiss & the Right to Bear Arms

{¶16} In his first assignment of error, Garrett argues that the trial court should have dismissed his weapons-under-disability charges because they violated the Second Amendment to the United States Constitution. In essence, he argues that R.C. 2923.13(A)(2) and (A)(3) are unconstitutional as applied to individuals who, like him, were previously convicted of violent felonies and drug felonies, respectively. Garrett further argues that, even if the Second Amendment did not prohibit these prosecutions, the Ohio Constitution did.

7

**{¶17}** Garrett's disability under R.C. 2923.13(A)(2), which underpinned Count 4 of the indictment, stemmed from his November 2020 conviction for aggravated assault in Clermont County. And his R.C. 2923.13(A)(3) disability, which provided the basis for Count 5, stemmed from a conviction entered on the same date for "trafficking in marihuana." At sentencing and by the agreement of the parties, the trial court merged Count 5 into Count 4, so that Garrett was sentenced only on the R.C. 2923.13(A)(2) violation. We therefore hold that, to the extent Garrett argues the trial court should have dismissed his R.C. 2923.13(A)(3) charge, his argument is moot. *Compare State v. Myers*, 2018-Ohio-1903, ¶ 138 (holding that a challenge to the sufficiency of evidence proving kidnapping was moot, because kidnapping count had been merged into aggravated-burglary count); *State v. McFarland*, 2020-Ohio-3343, ¶ 25 (considering sufficiency of the evidence supporting only claims that survived merger).

**{¶18}** With only Count 4 remaining, the question becomes: can the State, consistent with the state and federal constitutions, prohibit Garrett from possessing a firearm based solely upon his prior conviction for aggravated assault? Because the trial court resolved this constitutional question on a motion to dismiss, we consider it de novo. *See State v. Storms*, 2024-Ohio-1954, ¶ 10 (1st Dist.). After our de novo consideration, we answer, "Yes."

*1.*

**{¶19}** The Second Amendment to the United States Constitution, as interpreted by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), and *Bruen v. New York State Rifle & Pistol Assn.*, 597 U.S. 1, 70 (2022), enshrines and protects an individual right to keep and bear arms, both in the home and in public. That right is enforceable against the states through the Fourteenth

8

Amendment. *McDonald v. Chicago*, 561 U.S. 742, 791 (2010).

{¶20} A criminal law that punishes an individual for exercising their right to keep and bear arms is unconstitutional. U.S. Const., amend. II; *see Bruen* at 24 (conduct is only regulable if it "falls outside the Second Amendment's 'unqualified command'"). But what exactly does this "right" include? Under *Bruen*, we must answer this question by looking to text, and then to history. *Bruen* at 17, 24. First, we ask whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If so, that conduct is presumptively protected, and the State bears the burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

{¶21} In this case, the State has conceded that prohibiting individuals convicted of certain violent felonies from possessing firearms implicates the Amendment's "plain text." Thus, the burden shifts to the State to show that R.C. 2923.13(A)(2), as applied to the relevant class, comes within our Nation's historical tradition of firearms regulations. The State must show that its law is "'relevantly similar' to laws that our tradition is understood to permit," by identifying analogous gun regulations in our Nation's history and demonstrating that they "impos[ed] similar restrictions" on arms-bearing "for similar reasons." *See United States v. Rahimi*, 602 U.S. 680, 692 (2024), quoting *Bruen* at 29 and fn. 7.

{¶22} We have previously described R.C. 2923.13 as imposing a series of "categorical bans" on the keeping and bearing of arms, because the statute's provisions prohibit discrete classes of persons from possessing or carrying firearms altogether. *See, e.g.*, *State v. Thacker*, 2024-Ohio-5835, ¶ 17 (1st Dist.), *appeal accepted*, 2025-Ohio-705; *State v. Brown*, 2025-Ohio-8, ¶ 8-9 (1st Dist.), *appeal accepted*,

2025-Ohio-1090.[2] We have said that the State may "justify a categorical disarmament either (1) by pointing to a historical pattern of relevantly and specifically similar disarming statutes, or (2) by showing that it falls within our Nation's longstanding practice of allowing legislatures to disarm those they determine to be dangerous." (Cleaned up.) *Brown* at ¶ 10; *accord Thacker* at ¶ 54-56. Courts must scrutinize legislative determinations of dangerousness before accepting a danger-based categorical disarmament. *See Thacker* at ¶ 49, 86; *State v. Thurmond*, 2025-Ohio-5328, ¶ 19 (1st Dist.); *see also United States v. Williams*, 113 F.4th 637 (6th Cir. 2024).

**{¶23}** This court has held provisions of R.C. 2923.13 unconstitutional as applied to three defendants.

**{¶24}** *First*, in *Thacker*, this court held that R.C. 2923.13(A)(3), the drug-felony provision of the weapons-under-disability statute, was "unconstitutional as applied to an individual who . . . was (1) adjudicated delinquent as a minor (2) for nonviolent conduct, thus (3) disarming him, presumptively for life, (4) subject only to a trial court's discretionary determination whether to lift his disability." *Thacker* at ¶ 105. This holding was based on our Nation's historical practice of limiting the duration of danger-based disarmaments to the rough period during which that danger could be expected to persist. *See id.* at ¶ 51-52, 89. Historically, legislatures would disarm whole classes of persons for life when the dangers they posed could likewise be presumed to continue in perpetuity. *See id.* at ¶ 53, 96. In such cases, the disarmed individuals could bear the burden of showing that this presumption of danger was no

---

[2] While the Ohio Supreme Court has accepted discretionary appeals from our decisions in both *Thacker* and *Brown*, the Court is holding both appeals pending its resolution of the appeal from the decision in *State v. Striblin*, 2024-Ohio-2142 (5th Dist.), *appeal accepted*, 2024-Ohio-4713.

longer justified. *See id.* at ¶ 90. For example, early legislatures presumed certain British loyalists would remain loyal to the Crown and a threat to the United States. *See id.* at ¶ 96. So, we said, some legislatures disarmed these loyalists while permitting them to demonstrate that they no longer posed a threat by swearing an oath of allegiance to the new government. *See id.* at ¶ 46, 53, 89, 96.

**{¶25}** We then contrasted this historical tradition of presumptively-permanent disarmament for presumptively-permanent dangers with the State's application of R.C. 2923.13(A)(3) to Thacker. Under the statute, Thacker was presumed dangerous with a weapon in perpetuity, based only on his adjudication for a nonviolent juvenile drug violation, rendered in a system "predicated upon the assumption that those it adjudicates delinquent will be rehabilitated." *Thacker*, 2024-Ohio-5835, at ¶ 95 (1st Dist.). Thacker's juvenile adjudication therefore couldn't support a perpetual presumption of danger, as the State had "offered no examples of a presumptively permanent disarmament law at the founding that applied to individuals whom the state expressly presumed would *cease* to be dangerous." *Id.* at ¶ 96.

**{¶26}** *Second*, in *Brown*, 2025-Ohio-8, at ¶ 64 (1st Dist.), this court held that R.C. 2923.13(A)(2) was unconstitutional as applied to an individual indicted for (but not yet convicted of) a violent felony—at least where that defendant had not been individually disarmed as a condition of bail. Our holding in *Brown* rested largely on the joint history of sureties for the peace and recognizances for bail. These historically intertwined procedures, we said, suggested that the founding era had handled the problem of indictees with guns through *individualized* dangerousness determinations, not categorical ones. *Id.* at ¶ 53, 55. Thus, we held that the per se disarmament of felony indictees under R.C. 2923.13(A)(2) was at odds with our

Nation's history and tradition of firearms regulations. *Id.* at ¶ 55, 64.

**{¶27}** *Third* and finally, in *Thurmond*, 2025-Ohio-5328, at ¶ 28-29, 39 (1st Dist.), we reaffirmed and extended our holding in *Brown* to include an individual disarmed under R.C. 2923.13(A)(3) based on a pending indictment for a drug-related felony.

**{¶28}** Garrett's disability stems from a prior conviction, not an indictment, as in *Brown*, nor a juvenile adjudication, as in *Thacker*. Specifically, Garrett was convicted of aggravated assault. As in *Thacker* and *Brown*, the State has offered no examples of founding-era laws disarming individuals based on felony convictions. The State must therefore show that R.C. 2923.13(A)(2) created a "'legislatively determined proxy for a dangerousness determination'" that, as applied to Garrett, fits within our history and tradition of defining and disarming categories of "dangerous" persons. *See Brown* at ¶ 35, quoting *Thacker*, 2024-Ohio-5835, at ¶ 81 (1st Dist.). In assessing the State's arguments, we first consider "'whether the class of persons disarmed can reasonably be presumed dangerous with a firearm,'" and then "'whether the duration of the disarmament is realistically tailored to the danger persons in that class pose.'" *Id.* at ¶ 11, quoting *Thacker* at ¶ 54.

a.

**{¶29}** We begin by addressing whether Garrett's prior conviction for aggravated assault provided an adequate basis from which the legislature could determine he posed a particular danger with a firearm. A conviction for aggravated assault generally means the defendant, "while under the influence of sudden passion or in a sudden fit of rage," either knowingly caused "serious physical harm to another or to another's unborn," or else "attempt[ed] to cause physical harm . . . by means of a deadly weapon or dangerous ordnance." R.C. 2903.12(A). In this case, Garrett's

12

counsel represented to the trial court that Garrett's aggravated-assault conviction involved the use of both a knife and a firearm.

{¶30} We hold that Garret's prior aggravated-assault conviction provided an adequate basis from which the legislature could conclude that he posed a danger to the safety of others with a firearm. Garrett was previously convicted as an adult for engaging in acts of physical violence with a firearm. That conviction suggests that Garrett could pose a danger of future firearm-related violence towards others. Unlike the defendant in *Brown*, Garrett's prior conduct was substantiated by a conviction, not merely a charge. And unlike the defendant in *Thacker*, Garrett engaged in this unlawful conduct as an adult, not a child.

{¶31} Some of the "felony offenses of violence" listed under R.C. 2901.01(A)(9) and incorporated into R.C. 2923.23(A)(2) may raise difficult questions at the margins. But Garrett's is not an "edge case." Whatever the outer limits of the legislature's ability to presume dangerousness based on prior felony convictions, we hold that Garrett's conviction easily falls on the "constitutional" side of that line. *Compare Williams*, 113 F.4th at 658 ("[T]here is little debate that violent crimes are at least strong evidence that an individual is dangerous, if not totally dispositive on the question.").

b.

{¶32} But this court has also said that "the duration of the disarmament" must be "realistically tailored to the danger persons in that class pose." *Thacker*, 2024-Ohio-5835, at ¶ 54 (1st Dist.); *accord Brown*, 2025-Ohio-8, at ¶ 11 (1st Dist.). We have drawn this second requirement in part from *Rahimi*, 602 U.S. at 699, in which the Court emphasized the "limited duration" of the disarmament imposed by 18 U.S.C. 922(g)(8) in upholding that statute's application. However, we have also said

that some dangers can be presumed to persist: "The rule, so far as one can be devised, was that a disarmament based upon a presumptively temporary danger had to lapse of its own force, while a disarmament based on characteristics or risks presumed to be permanent could continue in perpetuity, subject to an individualized showing that the danger no longer existed." *Thacker* at ¶ 90.

**{¶33}** Because the disarmament imposed upon individuals convicted of violent felonies by R.C. 2923.13(A)(2) does not lapse of its own force, we must determine whether such individuals may be presumed dangerous in perpetuity. In *Thacker*, we expressly reserved this issue. *See Thacker* at ¶ 102.

**{¶34}** We now hold that the legislature could impose a presumptively permanent disarmament upon Garrett based on his prior conviction. At the founding, conduct like that prohibited by the aggravated-assault statute would certainly have warranted a perpetual presumption of dangerousness—"crimes against the person," such as "murder, rape, assault, and robbery," were common-law felonies and could lead to capital punishment in the late 18th century. *See Williams*, 113 F.4th at 658. The Sixth Circuit, in *Williams*, suggested that conviction for such crimes might today create "an irrebuttable presumption of dangerousness" for Second Amendment purposes. *Id.* At a minimum, it said, the burden of rebutting that presumption "would be extremely heavy." *Id.*

**{¶35}** Similarly, early American legislatures concluded that individuals "'notoriously disaffected to the cause of America'" had shown, by their allegiance to their former sovereign with whom this Nation was at war, that they might take up arms against the new country. *See Thacker*, 2024-Ohio-5835, at ¶ 46 (1st Dist.), quoting 4 *Journals of the Continental Congress, 1774-1789*, at 205 (Worthington Chauncey Ford Ed. 1906). Garrett's prior conduct furnished a far more direct basis from which to

conclude he might again take up his arms offensively against others—albeit, not for political reasons.

**{¶36}** And just as early legislatures allowed loyalists to be disarmed indefinitely until they had proven they no longer posed a risk, so, too, can present-day Ohio place the burden upon Garrett to show that he would no longer be a danger to others if allowed to keep and bear arms.

**{¶37}** Indeed, Garrett has cited no opinion from *any appellate court* in this country holding that the Second Amendment bars the presumptively permanent disarmament of an individual convicted of a violent felony. Instead, he relies on *Range v. Atty. Gen.*, 124 F.4th 218 (3d Cir. 2024) (en banc). But *Range* dealt with a decades-old conviction for "making a false statement to obtain food stamps." *Id.* at 222-223. And, as the Third Circuit noted, the Government had presented "no evidence that [Range] poses a physical danger to others or that food-stamp fraud is closely associated with physical danger." *Id.* at 230. This alone distinguishes *Range* from this case.

c.

**{¶38}** Finally, we note Garrett did not argue that he could or did rebut the presumption by showing that he, as an individual, was not dangerous. Accordingly, we need not address whether and by what procedures a defendant must be permitted to rebut the presumption of dangerousness on an individualized basis. *Compare*, *e.g.*, *Williams*, 113 F.4th at 657-658 (allowing individualized as-applied challenges to felon-in-possession prosecutions through individualized dangerousness hearings), *and State v. Hodges*, 2025-Ohio-5448, ¶ 20-21 (6th Dist.) (remanding for a dangerousness hearing), *with State v. Skaggs*, 2024-Ohio-4781, ¶ 28 (5th Dist.) (holding that R.C. 2923.13(A) "is not necessarily a lifetime ban" because a defendant can make "an

15

individualized showing of his qualification to bear arms" in a R.C. 2923.14 proceeding). *See also Thacker*, 2024-Ohio-5835, at ¶ 97-102 (1st Dist.) (holding that availability of R.C. 2923.14 procedures did not render Thacker's disability temporary, but "express[ing] no opinion" as to whether "such a discretionary regime . . . would be appropriate for individuals who can be presumed dangerous for life").

{¶39} In sum, we hold that the State could, consistent with our Nation's history and tradition, presume Garrett dangerous with a firearm for an indefinite period based on his prior aggravated-assault conviction. And because Garrett does not claim that he can rebut this presumption of dangerousness, his as-applied Second Amendment challenge to R.C. 2923.13(A)(2) fails.

*2.*

{¶40} Garrett also argues that his conviction violates the Ohio Constitution. In *Arnold v. Cleveland*, 67 Ohio St.3d 35, 48 (1993), the Ohio Supreme Court held that Article I, Section 4 of the Ohio Constitution requires that any law governing firearms be "a reasonable regulation, promoting the welfare and safety of the people." The Court has never walked back this view of the Ohio Constitution, and *Bruen*, however it may have affected federal law, has no bearing on the meaning of our state constitution. *See State v. Riffee*, 2025-Ohio-4886, ¶ 29 (1st Dist.) (holding that "*Arnold* is still good law" even after *Bruen*, and therefore applying the "reasonable regulation" test to resolve an Ohio constitutional challenge).

{¶41} Garrett developed no substantive argument that the application of R.C. 2923.13(A)(2) to him involved the sort of "clear and palpable abuse of power" that could be deemed "[un]reasonable" under *Arnold*. *See Arnold* at 48. We therefore reject Garrett's challenge under Ohio Const., art. I, § 4.

*3.*

**{¶42}** Because Garrett has failed to show that, as applied to him, R.C. 2923.13(A)(2)'s prohibition on possessing firearms violated the state or federal constitutions, his first assignment of error is overruled.

### B. *Motion to Compel Review of Police Files*

**{¶43}** In his second assignment of error, Garrett contends that the trial court erred in denying his motion to compel CPD to produce its entire file on his case to the prosecutors, and to compel the prosecutors to certify that they had reviewed it.

*1.*

**{¶44}** The impetus for Garrett's motion in this case was the tardy discovery of recorded witness interviews. The recordings were made by Detective Gregory, one of the CPD officers investigating K.H.'s murder, on May 4, 2023 (three days after the homicide). Initial discovery disclosures occurred on July 24, 2023, and were supplemented throughout the proceedings. Yet these interview recordings were not turned over until February 29, 2024, roughly nine months after they were made and seven months after initial discovery was delivered. During those intervening months, the State represented to the court that CPD had shared its whole file with the prosecutor's office, and that the prosecutor's office had provided Garrett with any discovery materials to which he was entitled.

**{¶45}** The State and CPD contended that this tardy disclosure was the result of an "oversight"—Detective Gregory had recorded the interviews on an older recording device that did not automatically upload its recordings, and he had forgotten to transfer those recordings manually prior to sending the prosecutors his file. Garrett, however, was concerned that CPD's failure to share these interviews with prosecutors until two weeks before his trial might have been intentional, and that there might be

more undisclosed evidence in CPD's file.

**{¶46}** Garrett then moved the trial court for an order requiring (1) that two CPD officers who investigated Garrett's case provide the entirety of their investigative file to the prosecutor's office, (2) that members of the prosecutor's office review that entire file to ensure it had no additional evidence that had to be disclosed to Garrett, and (3) that the prosecuting attorneys then take the stand to "represent to the Court the results of the independent review they conduct." The trial court found that the State's nondisclosure had been the result of a good-faith mistake and denied the motion. It did, however, continue the trial to allow Garrett the opportunity to investigate any new leads suggested by the recordings.

*2.*

**{¶47}** We review a trial court's disposition of discovery issues for an abuse of discretion. *See State ex rel. The V Cos. v. Marshall*, 1998-Ohio-329, ¶ 11.

**{¶48}** "The Ohio Rules of Criminal Procedure grant the trial court discretion to regulate the criminal discovery process." *State v. Pittman*, 2023-Ohio-1990, ¶ 9 (1st Dist.). To that end, Crim.R. 16 provides that "[t]he trial court may make orders regulating discovery not inconsistent with" the requirements expressly set out in the rules. Crim.R. 16(L)(1). If a party "has failed to comply" with Crim.R. 16 or an order issued under that rule, then "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." *Id.* However, a court imposing a discovery sanction should employ the "'least severe sanction that is consistent with the purpose of the rules of discovery.'" *See State v. Darmond*, 2013-Ohio-966, syllabus, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987), paragraph two of the syllabus.

18

**{¶49}** The State characterizes the procedures requested in Garrett's motion as "extraordinary" and beyond a trial court's power to impose. We disagree. Garrett's proposed order would impose no new substantive disclosure obligations upon the State. Both the federal constitution and the Ohio Rules of Criminal Procedure already require the State to disclose any evidence it possesses that would be favorable to the defendant and material to his guilt. *See* Crim.R. 16(B)(5); *State v. McNeal*, 2022-Ohio-2703, ¶ 19, citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (describing this as an affirmative duty). And the prosecutors' duty to disclose under the Due Process Clause already includes an affirmative duty "to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). Garrett's requested order would simply have required the State's agents to certify that they had complied with these preexisting duties.

**{¶50}** Nor would Garrett's requested order have subjected the prosecuting attorneys to direct, punitive sanctions. The Ohio Supreme Court cases upon which the State relies concerned discovery sanctions tantamount to default judgments for the opposing party. *See Darmond* at ¶ 13 (dismissal of prosecution with prejudice); *Lakewood* at 2 (exclusion of all of defendant's witnesses). But here, the State remained fully able to prosecute its case, and any punitive consequences would come only as a result of noncompliance with the certification order or failure to comply with preexisting disclosure obligations.

**{¶51}** But while the trial court may have had remedial authority to impose the requested order under Crim.R. 16, we cannot say it abused its discretion by declining to do so here. In deciding whether and how to impose discovery sanctions, a trial court must consider "whether violation of the discovery rules was willful or in bad faith" as

one of several factors. *Lakewood*, 32 Ohio St.3d at 5. In this case, the trial court accepted the State's representations that its failure to disclose the recordings was the result of an honest technical error on the part of CPD and the prosecutors. The court therefore found no bad faith or willful misconduct and declined to impose any sanctions beyond granting a continuance.

{¶52} Garrett argues that the Hamilton County Prosecutor's Office's well-documented history of *Brady* and discovery violations required a different result. But the question before the trial court was whether the violation *in this case* was the result of bad faith or willful misconduct, not whether the prosecutor's office had a history or pattern of bad-faith violations. Evidence of the latter may be probative evidence of the former. But the court below, even with the benefit of that evidence, found no bad faith or willful misconduct here. It therefore concluded that a continuance was the appropriate sanction. We cannot say it acted unreasonably or arbitrarily in doing so.

{¶53} Accordingly, we hold that the trial court did not abuse its discretion by denying Garrett's motion to compel. Garrett's second assignment of error is overruled.

### C. Hearsay Evidence

{¶54} In his third assignment of error, Garrett argues that the trial court erred in admitting certain testimony from Detective Gregory concerning his interview of L.R. Specifically, Garrett contends that the rule against hearsay barred statements by L.R. embedded in the following exchange:

PROSECUTOR: And how did you know—do you believe that [L.R.] was being truthful with you?

DETECTIVE: No.

PROSECUTOR: And tell us why.

DETECTIVE: Can I—I'm sorry—I don't want to misspeak. There

were portions of her first statement that were true. We just believed she wasn't telling us the whole truth.

PROSECUTOR: And why was that?

DETECTIVE: We knew that the incident started inside of the apartment.

PROSECUTOR: Okay.

DETECTIVE: And she was eliminating that part. And we believed she knew the person who was with her that night—who the shooter was.

PROSECUTOR: And do you remember how long you left the room for that first time?

DETECTIVE: Probably—not a long period of time. Probably 10 minutes, 15 minutes, just to regroup and come up with a new plan.

PROSECUTOR: And when you entered the room for the second time did you have a new plan?

DETECTIVE: We did.

PROSECUTOR: And what was that?

DETECTIVE: We started off the interview by reading her her Miranda Rights, and we started being a little more firm, saying: We know you know more. And she immediately started telling us the story.

PROSECUTOR: Now, when you concluded with your interview with [L.R.], did you have an idea of who shot [K.H.]?

DETECTIVE: We did.

PROSECUTOR: Who is that?

DETECTIVE: Nolan Garrett.

**{¶55}** Garrett argues that this final response, "Nolan Garrett," contained an embedded hearsay statement, because it effectively communicated the content of L.R.'s out-of-court statements inculpating Garrett.

**{¶56}** Hearsay consists of "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). Generally, hearsay is inadmissible unless it falls within an enumerated exception. *See* Evid.R. 802. We review hearsay rulings for an abuse of discretion. *State v. McCloud*, 2024-Ohio-2190, ¶ 26 (1st Dist.).

**{¶57}** This case is effectively indistinguishable from *State v. Smith*, 2022-Ohio-2592 (1st Dist.). In that case we held that the following exchange was admissible nonhearsay because it involved only a "detective's own declarations explaining the steps in his investigation":

PROSECUTOR: Did you—based upon the conversation and the investigation undertaken with Donna Super and Brandon Super, did you go to the Drop-Inn Center?

DETECTIVE: Myself and Officer Newsom met at the Drop-Inn Center, yes.

. . .

PROSECUTOR: Were you speaking with the individuals at the Drop-Inn Center about an individual with the last name Smith?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

DETECTIVE: That is correct.

. . .

PROSECUTOR: So you investigated at the Drop-Inn Center

about someone with the last [name] Smith staying there?

DETECTIVE:  That's correct.

PROSECUTOR:  And based upon information obtained from the

Drop-Inn Center, did you compile, develop an individual as a suspect?

DETECTIVE:  We did[.]

PROSECUTOR:  What's the name of the suspect you developed

based on your investigation?

DETECTIVE:  Kevin Smith.

(Bracketed text in original.) *Smith* at ¶ 9-10.

**{¶58}**  Like Detective Gregory, the detective in *Smith* merely said that they had spoken with individuals to investigate a lead and, when prompted, said the name of the suspect they developed following those conversations. Just as in this case, any reasonable listener could infer that the witness's statements to the detective pointed the finger at the defendant. Indeed, the *Smith* court conceded that the underlying statement made to the detective, were it repeated, might have been hearsay. *See Smith* at ¶ 10 ("[T]o be sure, Mr. Super's statements connecting Mr. Smith with the crime might be hearsay . . . ."). Nevertheless, *Smith* held that nothing in the detective's testimony was barred by the rule against hearsay, because "any testimony about what [the interlocutor had] said" was "[m]issing from this excerpt." *Id.*

**{¶59}**  Garrett does not challenge our holding in *Smith* but instead argues that the detective's testimony in this case should be barred under the rule in *State v. Ricks*, 2013-Ohio-3712, ¶ 27. *Ricks* held that an officer may repeat an out-of-court statement "for the nonhearsay purpose of explaining [the officer's] next investigative step" only if three criteria are met. *State v. Montgomery*, 2016-Ohio-5487, ¶ 88, discussing *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980), and *Ricks* at ¶ 27. The *Ricks* rule rests on

the premise that, even when an officer repeats an out-of-court statement in order to explain his investigation, there is a risk the jury will nevertheless "rely on the testimony to prove the matter asserted," thereby "tilt[ing] the particular testimony into hearsay." *Ricks* at ¶ 26.

{¶60} But under *Smith*, there is no out-of-court statement here to which we could apply *Ricks*. The rule against hearsay applies only if (1) there is an out-of-court statement, and (2) that statement is admitted for the truth of the matter it asserts. *See* Evid.R. 801(C). *Ricks*'s three-part test concerns the second prong of this definition— whether an out-of-court statement is being admitted *for its truth*. *See Ricks* at ¶ 26. But *Smith* involved the first prong; its premise was that, when counsel asks an officer-witness, "After speaking with the witness, did you have a develop a suspect in your investigation?" and the officer replies, "Yes—the defendant," the officer has introduced no out-of-court statement *at all*. *See Smith*, 2022-Ohio-2592, at ¶ 10 (1st Dist.) (holding that "the only statements that this line of inquiry elicited were the detective's own declarations"). No out-of-court statements means no hearsay, regardless of how the *Ricks* factors play out.

{¶61} *Smith* remains the law in this District, and it is on all fours with Garrett's case. Garrett has not asked us to reconsider that precedent and has provided no plausible way to distinguish it. We therefore apply *Smith* and hold that the challenged portion of Detective Gregory's testimony relayed no out-of-court statements, and therefore no hearsay. Garrett's third assignment of error is overruled.

### D. Venue

{¶62} In his fourth assignment of error, Garrett argues that the State presented insufficient evidence of venue.

{¶63} On a sufficiency challenge, our task is to ensure that the State met its

burden of production at trial. *See State v. Messenger*, 2022-Ohio-4562, ¶ 26; *State v. Walker*, 2025-Ohio-2982, ¶ 11 (1st Dist.). In the venue context, that refers to the State's burden to show "that the crime alleged in the indictment occurred in the county where the indictment was returned." *State v. Nevius*, 147 Ohio St. 263 (1947), paragraph three of the syllabus; *see also State v. Foreman*, 2021-Ohio-3409, ¶ 13; R.C. 2901.12(A); Ohio Const., art. I, § 10. Thus, to resolve a sufficiency challenge with respect to venue, we ask whether the State's evidence, viewed in the light most favorable to the State, could prove that the crime occurred in the county where the defendant was indicted. *See State v. Thurmond*, 2023-Ohio-2404, ¶ 7 (1st Dist.).

**{¶64}** The evidence the State may use to satisfy its burden can be direct or circumstantial. *See State v. Smith*, 2024-Ohio-5030, ¶ 2 (per curiam). And where a trial court sits "without a jury," it may "take judicial notice that the geographical area of its jurisdiction, such as a county, contains a named street or a certain portion thereof." (Cleaned up.) *State v. Tapke*, 2007-Ohio-5124, ¶ 58 (1st Dist.).

**{¶65}** Garrett argues that no evidence specifically identified that the location of the shooting was in Hamilton County. Detective Gregory testified that the Highland Avenue apartment building was in Hamilton County, Ohio. Further testimony established that the shooting took place outside a Taco Bell near that address. But Garrett argues that this was insufficient, because the State never elicited testimony regarding an address or cross-street for the Taco Bell itself. He contends that the trial court could not be sure that the Taco Bell and the apartment building were not on opposite sides of a county line.

**{¶66}** But the venue requirement was easily satisfied in this case when the trial court took "judicial notice that the entire action took place in Hamilton County, Ohio." That judicial notice was obviously proper, as the trial judge had *visited both locations*

25

*herself* as part of a "bench view." If a trial court sitting without a jury is permitted to judicially notice that certain streets are within its geographical jurisdiction, *Tapke* at ¶ 58, then it follows a fortiori that it may take notice that the places it visits as part of the trial are likewise within its jurisdiction.

**{¶67}** Accordingly, we hold that the trial court had ample evidence from which it could conclude that venue was proper in Hamilton County, so we overrule Garrett's fourth assignment of error.

### E. *Manifest Weight of the Evidence*

**{¶68}** In his final assignment of error, Garrett argues that his convictions were against the manifest weight of the evidence.

**{¶69}** A manifest-weight challenge ensures that the State met its burden of persuasion at trial. *See Messenger*, 2022-Ohio-4562, at ¶ 26; *State v. Gibson*, 2023-Ohio-1154, ¶ 39 (1st Dist.). In assessing whether a conviction is against the manifest weight of the evidence, we review the record ourselves, then weigh the evidence and all reasonable inferences to ensure that the factfinder—whether judge or jury—did not clearly lose its way in finding guilt beyond a reasonable doubt. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *State v. Thompkins*, 1997-Ohio-52, ¶ 25. To do this, we must necessarily assess credibility, where such assessments can be made from a cold record. *See Thompkins* at ¶ 25. But the factfinder, not this court, had the opportunity to observe the witnesses firsthand. *See State v. Railey*, 2012-Ohio-4233, ¶ 14 (1st Dist.). So we generally defer to the factfinder's credibility determinations, except in those "most exceptional circumstances" when the factfinder "disregarded or overlooked compelling evidence" that contradicted its findings. *Gibson* at ¶ 39. If we find that the trial court lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice, we will reverse its judgment

26

and order a new trial. *Martin* at 175; *Thompkins* at ¶ 25.

{¶70} In this case, the trial court gave detailed reasons for its decision and made on-the-record findings, which we can review. These findings focused on the testimony of two witnesses: L.R. and the Taco Bell employee who witnessed the shooting.

{¶71} L.R. testified that she had an on-again-off-again romantic relationship with K.H. At the time of the shooting, K.H. and L.R. had been in an "off" phase, during which L.R. had begun seeing Garrett casually. L.R. said that, on the night prior to the shooting, Garrett had stayed with her on the living-room futon of a friend's apartment on Highland Avenue.

{¶72} The next morning, L.R. continued, K.H. came to the apartment to drop off some money he owed her. While there, K.H. became confrontational and acted "like he was gonna put his hands on [L.R.]." L.R. testified that Garrett tried to intervene and tell K.H. to calm down, but K.H. hit him. Garrett punched back and the two fought until K.H. pinned Garrett to the couch. K.H. then instructed L.R. to open the front door of the apartment, and, when she had done so, fled out through it. L.R. tried to block Garrett from following, but Garrett pushed past her, causing her to fall. Shortly thereafter, L.R. heard several gunshots. She ran outside, where she saw K.H. on the ground in the rocks. L.R. said that, while she was outside, Garrett rushed past her away from the scene and toward the apartment, but that she never saw whether Garrett went back inside.

{¶73} L.R. gave conflicting testimony about whether she had seen Garrett with a gun prior to the shooting.

{¶74} The trial court found some parts of L.R.'s testimony credible, but not others. It disregarded all of L.R.'s inconsistent statements about whether Garrett had

a gun. But it found that L.R.'s descriptions of Garrett fleeing the scene of the shooting were "credible, unequivocal, and consistent several times." The trial court noted that video from cameras positioned on a passing Metro bus and on the exterior of the Taco Bell corroborated L.R.'s testimony on this score, as they showed a man running away from where K.H.'s body would have been and passing a red-haired woman. Detective Gregory identified the same red-haired figure, seen in a later part of the video, as L.R.. Garrett does not contest that L.R. was the red-haired woman.

{¶75} The trial court also found the testimony of the Taco Bell employee to be "credible" and gave it "great weight." The employee testified that she had been working the drive-through when she saw a man in a "wife-beater" tank top chasing a man in a hoodie with short hair. She described that man in the tank top as having his hair in "plaits" and a complexion slightly lighter than hers. When the man in the hoodie tripped, the man in the tank top caught up to him, and the two began "tussling." Then, the man in the tank top put a gun in the other man's stomach and fired multiple times. The employee was "maybe 20 feet, 15 feet" from the fighting men. After the shooting, she said, a "female came up with red hair" and "crossed paths" with the shooter in the tank top, who was running away with the gun.

{¶76} The trial court cited three pieces of corroborating evidence that reinforced the employee's credibility. *First*, the court noted that video from inside the Taco Bell showed the employee watching and reacting to the events through the drive-through window. *Second*, the trial court found that the employee's description of K.H. being shot in the stomach was consistent with the coroner's testimony that K.H.'s body had a gunshot wound from where a bullet had grazed his abdomen. *Third*, the trial court noted that the witness's description of what transpired after the shooting comported with both L.R.'s account of Garrett's flight and the footage from the

cameras on the Metro bus camera and the exterior of the Taco Bell.

{¶77} The trial court also credited the Taco Bell employee's identification in open court of Garrett as the tank-top-wearing shooter. Although she "had never seen [Garrett] before" the shooting and "did not know him," the trial court credited the employee's memory because she apparently had never been shown Garrett's picture by the police in the interim. Indeed, the witness testified that she had not known that anyone had been arrested for the shooting or that the case was going to trial until the day before the trial began.

{¶78} The trial court disregarded the testimony of the two HVAC technicians who witnessed the shooting from roughly 200 feet away. The court found that their distance, inconsistent reports, and visual limitations rendered their testimony unreliable.

{¶79} But even limiting itself to the testimony of the Taco Bell employee and the portion of L.R.'s testimony corroborated by the videos, the trial court found that Garrett had shot and killed K.H. These two witnesses alone provided credible evidence that a man in a white tank top shot K.H. in the stomach near the Taco Bell, headed back in the direction of the Highland Avenue apartment, and passed L.R. on the way. Further, both the Taco Bell employee, who had no reason to lie and no prior relationship with Garrett or K.H., and L.R., who was romantically involved with Garrett at the time, identified the tank-top-wearing figure as Garrett.

{¶80} Garrett argues that inconsistencies and witness bias undermine the trial court's credibility findings. He attacks L.R.'s credibility based on her relationship with K.H., who allegedly owed her money; on her shifting story; and on her alleged drug use. But the only portion of L.R.'s testimony on which the trial court relied was her testimony that Garrett rushed past her after the shooting. And none of the concerns

Garrett raises—not that K.H. may have owed L.R. money, nor that L.R. allegedly used drugs, nor that she often changed other parts of her story—explain why L.R. would misidentify her current romantic partner as the man seen fleeing past her in the surveillance videos. Accordingly, the trial court did not lose its way in accepting L.R.'s testimony about Garrett's flight.

{¶81} Garrett also seeks to attack the testimony and identification of the Taco Bell employee. He points out (1) that she described the shooter as six inches shorter than Garrett, (2) that she did not recall seeing Garrett's large shoulder tattoo on the shooter's bare arms, and (3) that she described the shooter's hair as in "plaits," even though other witnesses described him as having "dreads." Further, Garrett suggests (4) that the employee's testimony about how the shooter "kept shooting [K.H.] in the stomach" was inconsistent with the single graze wound to K.H.'s abdomen, and (5) that the employee's in-court identification was not compelling, given the suggestiveness of Garrett's presence at the defense table, and the employee's refusal to view any potential suspect photos at the time of the shooting.

{¶82} But the trial court deemed the employee's testimony credible on the major points: two men ran up, they "tussled," and the one in a white tank top shot the one in a hoodie in the stomach before walking away past a red-haired woman. Garrett does not dispute that K.H. was shot, nor that the employee watched it happen through the drive-through window. And Garrett acknowledges that this employee—apparently a stranger to both killer and victim—had no obvious reason to lie. The trial court clearly did not believe that the various inconsistencies rendered the core of the employee's testimony unbelievable. The entire fight and shooting occurred in a span of seconds. It seems entirely reasonable that, a year later, the employee might remember the major details of that fight, while misremembering some specifics, like the shooter's

height, hairstyle, or tattoos, or whether the shooter moved the gun after firing the first shot into K.H.'s stomach.

**{¶83}** Nor do these discrepancies suggest the trial court lost its way in accepting the employee's in-court identification of Garrett. If the only evidence identifying Garrett as the shooter were the employee's in-court identification a year after the shooting, we might, indeed, be troubled. But here, the employee's identification was corroborated by L.R.'s identification of Garrett as the man who rushed past her in a white tank top in the surveillance videos.

**{¶84}** Garrett also challenges the credibility of various other witnesses and points to several alleged deficiencies in CPD's investigation. But the trial court either did not rely upon these witnesses' testimony or expressly disregarded it, and Garrett offered no coherent theory as to why CPD's alleged deficiencies have undermined the testimony on which the trial court *did* rely.

**{¶85}** All in all, we cannot say that the trial court "lost its way" and created a "manifest miscarriage of justice" in accepting the relevant portions of L.R.'s and the employee's respective testimony and in finding Garrett guilty of K.H.'s murder. Further, there is no dispute that K.H. was killed with a gun, and that Garrett was disabled from possessing a firearm by virtue of his prior conviction. We therefore hold that Garrett's convictions for murder and having a weapon while under a disability were not against the manifest weight of the evidence. Garrett's fifth assignment of error is overruled.

### III. CONCLUSION

**{¶86}** Having overruled all five of Garrett's assignments of error, we affirm the trial court's judgment of conviction.

Judgment affirmed.

**KINSLEY**, **P.J.**, and **NESTOR**, J., concur.