[Cite as *State v. Gibson*, 2023-Ohio-1154.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220176 |
| | | TRIAL NO. B-1607179A |
| Plaintiff-Appellee, | : | |
| | : | *O P I N I O N.* |
| vs. | | |
| | : | |
| MARIO GIBSON, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: April 7, 2023


*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Krista M. Gieske*, Assistant Public Defender, for Defendant-Appellant.

**BERGERON, Judge.**

{¶1} Three years after the tragic shooting of innocent bystander Iesha Williams, the state charged defendant-appellant Mario Gibson with various counts of murder, felonious assault, and having weapons while under disability. Following a bench trial, the court found him guilty on all counts except for the aggravated murder charge, sentencing him to prison for 37 years to life. On appeal, Mr. Gibson presents three assignments of error relating to certain witnesses' grand jury testimonies, which the trial court refused to order the state to disclose, a fourth assignment of error challenging the weight and sufficiency of the evidence in his case, and a fifth assignment of error raising a sentencing issue. After reviewing the complete record and relevant case law, we must overrule his first four assignments of error. But because the trial court improperly employed an allied offenses analysis to justify ordering his firearm specifications to run consecutively (a point the state concedes), we sustain Mr. Gibson's fifth assignment of error, reversing the trial court's judgment and remanding on this issue for the limited purpose of resentencing.

I.

{¶2} Mr. Gibson and his codefendant, Akyame Daniels, were ultimately charged with and convicted of various offenses in connection with the murder of Ms. Williams. In order to properly understand the nuances of this case and the issues germane to Mr. Gibson's appeal, we must first chronicle the complex web of facts, including two separate shootings and the roles of numerous witnesses and involved persons.

{¶3} In January 2016, Mr. Daniels lived at the home of his grandmother on the first floor of a three-story duplex in Avondale. Several of Mr. Daniels's family

2

members, including a cousin, Kenny Gunn, Sr., lived there as well. Mr. Gibson, who had known Mr. Daniels for years, resided on the third floor of the duplex.

{¶4} A few days prior to January 14, 2016, Mr. Daniels asked Erron Jones for a ride to a nearby gun shop to purchase a weapon. Two other men, including victim Quentin Cooper, joined them on the excursion. After Mr. Daniels purchased a gun with cash, Mr. Jones drove them to an abandoned house. Mr. Cooper then struck Mr. Daniels in the head with a handgun and stole his remaining cash and new gun. Mr. Daniels leapt out of the car and confronted Mr. Jones, who then threatened Mr. Daniels to "watch out." After Mr. Daniels exited from the car and made his escape, the other three men drove off.

{¶5} Mr. Daniels then returned to his grandmother's home and reported the robbery to Cincinnati Police Officer Richard Minella. Still seething, he engaged in a heated texting exchange with Mr. Jones regarding the incident.

{¶6} Back at the duplex, in the common area, Mr. Daniels announced to all who were present that he had just been robbed and that the perpetrators stole his gun. This, according to Mr. Daniels, angered Mr. Gibson and, after they stepped outside, he handed Mr. Daniels a gun (which Mr. Gibson denies).

{¶7} While Mr. Daniels continued to linger outside, Mr. Jones, driving the same car as earlier in the day, pulled around the corner and drove toward him. Mr. Jones began shooting from the driver's side and Mr. Cooper shot from the passenger side while leaning over the car's roof. Mr. Daniels shot back, apparently striking a back window of the car as it drove off. Luckily, no one was harmed during this shoot-out. Mr. Gunn also witnessed the drive-by shooting, but immediately left the scene to avoid police because he had drugs in his car. When Mr. Gunn returned to the duplex,

3

he overheard Mr. Gibson, Mr. Daniels, and others discussing the drive-by shooting. Monquantis Castille, who lived one street up from the duplex, also witnessed the drive-by. And in 2017, during an interview with the police, Mr. Jones admitted to committing the initial drive-by shooting.

{¶8} After the drive-by, Mr. Daniels allegedly asked Mr. Gibson if they should follow Mr. Jones and Mr. Cooper, to which he agreed. Mr. Gibson asked Mr. Daniels to drive his car, a gray Nissan Maxima, and both men jumped in the car, armed. Mr. Gunn and Mr. Castille both testified that they witnessed Mr. Daniels and Mr. Gibson driving off in the Maxima. Mr. Gibson, however, maintains that he went inside his home *before* the drive-by shooting, then later went to a nearby location to purchase marijuana, and returned to his home to spend the remainder of the evening inside his apartment, alone.

{¶9} According to Mr. Daniels's account, he and Mr. Gibson followed the car to an apartment in Winton Terrace and saw Mr. Cooper wander outside. Mr. Cooper hopped into the front passenger seat of a red Chevrolet Avalanche with another person and they drove off. Mr. Daniels followed them to Reading Road under the overpass of the Norwood Lateral. He pulled up alongside the car and Mr. Gibson, who had jumped in the backseat, opened fire. Mr. Daniels claimed that Mr. Gibson ordered him to fire as well. Mr. Daniels rolled down the window, and, holding his gun in his right hand, shot over his left hand that was on the steering wheel. Mr. Daniels estimated that he fired three shots at Mr. Cooper. But unbeknownst to Mr. Daniels, his cousin, 24-year old Iesha Williams (also the daughter of Mr. Gunn) was driving the Avalanche. She was shot in the right side of her back.

{¶10}   The Avalanche continued for a short distance and then struck the back of a Metro Access bus.  Mr. Cooper, unscathed, immediately fled from the scene on foot.  Mr. Daniels drove back to his neighborhood.  At the crime scene, investigators located shell casings from two guns.

{¶11}   When gathering information about suspects, police interviewed Terea Brown, who lived with Ms. Williams and her children.  Ms. Brown knew that Ms. Williams was dating a man but did not know his name.  On January 14, 2016, Ms. Brown lent her Chevrolet Avalanche to Ms. Williams so she could run some errands.  Later that day, Ms. Brown received a call from Ms. Williams's cell phone and learned that she had been in an accident.  Ms. Brown rushed to the crash site, and later, to the hospital.  While there, Ms. Brown learned that Ms. Williams's boyfriend had been in the accident with her. When questioned by Detective Carl Blackwell, the initial investigator on the case, Ms. Brown identified Mr. Cooper as Ms. Williams's boyfriend in a photo lineup.

{¶12}   Detective Blackwell zeroed in on Mr. Daniels as a suspect, and also spoke with Mr. Gunn, who identified Mr. Gibson as a potential suspect.  When first questioned by the police, Mr. Daniels denied his involvement in the second shooting, but ultimately, he admitted his culpability.

{¶13}   Ten days after the shooting, Ms. Williams died and Homicide Detective Keith Witherell took over the case.  Detective Witherell spoke with Detective Blackwell about his investigation, and he also spoke with Ms. Brown and learned of the connection between Mr. Cooper and Mr. Jones.

{¶14}   From interviews with Mr. Gunn and Mr. Castille, Detective Witherell learned information that corroborated Mr. Gunn's statements.   However, the

5

investigation progressed slowly as many members of the community were unwilling to come forward and speak with police, nor were they forthcoming when questioned. Roughly a month after his first interview, Mr. Castille gave an abbreviated statement before a grand jury, memorializing his testimony under oath.

{¶15} About a year after the shooting (in February 2017), police arrested Mr. Gibson in connection with the murder. Detective Witherell interviewed Mr. Gibson and recorded the interview. Mr. Gibson denied any involvement in Ms. Williams's death but acknowledged his presence during the drive-by shooting that occurred after the robbery of Mr. Daniels. He stated that he saw a knot on Mr. Daniels's forehead consistent with a pistol-whip injury. Mr. Gibson steadfastly maintained his innocence.

{¶16} In March 2019, the state indicted Mr. Gibson and Mr. Daniels in connection with the 2016 death of Iesha Williams. Mr. Gibson was charged with aggravated murder, murder, and felony murder in the death of Ms. Williams and three counts of felonious assault against Ms. Williams and Mr. Cooper, all with firearm specifications, as well as two counts of having weapons while under disability. During his trial nearly three years later, Mr. Gibson waived a jury, and following a three-week bench trial, the trial court acquitted Mr. Gibson of aggravated murder but rendered guilty verdicts on the remaining charges. The court merged allied offenses and certain specifications for sentencing purposes, and imposed consecutive sentences for murder and felonious assault. The court ultimately imposed an aggregate prison term of 37 years to life.

{¶17} Mr. Gibson timely appealed, raising five assignments of error.

II.

**{¶18}** In his first assignment of error, Mr. Gibson asserts that the trial court erred in failing to order the state to relinquish the grand jury testimony of Mr. Castille, one of the witnesses who claimed to have seen Mr. Gibson and Mr. Daniels drive off together before the shooting of Ms. Williams. According to Mr. Gibson, Mr. Castille's sworn statement before the grand jury was discoverable pursuant to Crim.R. 16(B)(7). The statement, Mr. Gibson posits, was made for investigative purposes and therefore should not be shrouded by the secrecy typically afforded to grand jury proceedings under R.C. Chapter 2939 and Crim.R. 6.

**{¶19}** At the outset, the parties debate whether Mr. Gibson preserved his Crim.R. 16(B)(7) argument because trial counsel did not expressly raise this argument at the trial level. But this court may consider any issue implicit in another issue that counsel raised below and features on direct appeal. *See Snyder v. Lawrence*, 7th Dist. Carroll No. 19 CA 0938, 2020-Ohio-3358, ¶ 28, quoting *Belvedere Condominium Unit Owners' Assn. v. R.C. Roark Cos., Inc.*, 67 Ohio St.3d 274, 279, 617 N.E.2d 1075 (1993) (" 'When an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, [the appellate court] may consider and resolve that implicit issue.' "). Trial counsel in this case did seek disclosure of Mr. Castille's testimony at trial, and the argument on appeal is intertwined with the disclosure issues raised at the trial level. Finding the matter sufficiently preserved, we proceed to review the merits of whether the trial court erred in refusing to order the state to turn over Mr. Castille's grand jury statement pursuant to Crim.R. 16(B)(7).

**{¶20}** In criminal cases, due process requires that the accused be afforded a meaningful opportunity to present a complete defense. *See State v. Hale*, 119 Ohio

St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 46; *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.E.2d 413 (1984). With respect to access to prior witness testimony specifically, the law draws a distinction between prior statements of a witness in general and prior statements of a witness before a grand jury. *See State v. Greer*, 66 Ohio St.2d 139, 149, 420 N.E.2d 982 (1981). Pursuant to Crim.R. 16, prior witness statements outside of the grand jury context are subject to discovery. Crim.R. 16(B)(7) ("Upon receipt of a written demand for discovery by the defendant, * * * the prosecuting attorney shall provide * * * the following items[:] * * * Any written or recorded statement by a witness in the state's case-in-chief[.]"). But, as discussed in greater detail in our review of the second and third assignments of error, Crim.R. 6 generally governs witnesses' statements before a grand jury, providing for much more limited discovery. In general, we review trial court decisions pertaining to discovery matters for an abuse of discretion. *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, 909 N.E.2d 1237, ¶ 13.

{¶21} Here, Mr. Gibson insists that Mr. Castille's testimony before the grand jury was a façade to "shield" his testimony from being turned over to the defense—and thus it should not be considered grand jury testimony. To reach this conclusion, Mr. Gibson refers us to a distinction drawn by the state at trial. The prosecutor explained that, in order for something to be "presented" to the grand jury, the grand jury must ultimately vote on whether to issue an indictment. This can be differentiated from situations—like Mr. Castille's—in which witnesses testify in front of a grand jury to lock in their testimony under oath without an ensuing grand jury vote. Mr. Gibson maintains that, because Mr. Castille's testimony before the grand jury falls within the latter category, it is not subject to traditional rules governing the discoverability of

grand jury testimony (including Crim.R. 6). But Mr. Gibson does not point us toward any governing case law or other authority indicating that, when a witness testifies before a grand jury that does not directly lead to a vote for an indictment, it necessarily removes this testimony from the ambit of Crim.R. 6. Because Mr. Gibson fails to establish that Mr. Castille's testimony should be treated as a "written or recorded statement by a witness" pursuant to Crim.R. 16(B)(7), it falls within the scope of Crim.R. 6. *See State v. O'Leary*, 12th Dist. Butler No. CA2013-01-009, 2013-Ohio-5670, ¶ 31 ("Crim.R. 16(J)(2) specifically enumerates that transcripts of grand jury testimony are * * * governed by Crim.R. 6."). And we consider the discoverability of Mr. Castille's grand jury testimony under Crim.R. 6 in our review of Mr. Gibson's second assignment of error.

{¶22} Even if Mr. Gibson could establish that Mr. Castille's grand jury testimony was subject to disclosure pursuant to Crim.R. 16, as explained in further detail below, the trial court's failure to order disclosure amounts to harmless error. Mr. Gibson sought Mr. Castille's testimony to impeach his credibility. Specifically, he explained that he hoped to obtain Mr. Castille's grand jury testimony in order to establish that Mr. Castille was released from River City (a mandated rehabilitation program) in exchange for his testimony. But Mr. Gibson had the opportunity to explore Mr. Castille's potential motive to lie at trial, and he received access to the date of his release from River City in order to bolster this argument. Therefore, the trial court's failure to order disclosure of the grand jury testimony did not prejudice Mr. Gibson and the error, if any, was harmless.

{¶23} We accordingly overrule Mr. Gibson's first assignment of error.

9

III.

**{¶24}** In his second assignment of error, Mr. Gibson claims that the trial court erred in refusing to conduct an in camera review and in refusing to order disclosure of the grand jury testimony of Mr. Castille and Mr. Gunn upon defense counsel's showing of particularized need. The state responds that defense did not demonstrate a particularized need for either witness's testimony.

**{¶25}** Crim.R. 6(E) provides, in pertinent part:

> **Secrecy of proceedings and disclosure.** Deliberations of the grand jury and the vote of any grand juror shall not be disclosed. * * * A grand juror, prosecuting attorney, interpreter, court reporter, or typist who transcribes recorded testimony, may disclose other matters occurring before the grand jury, only when so directed by the court preliminary to or in connection with a judicial proceeding, or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury.

Due to the secret nature of grand jury proceedings, " 'an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy.' " *State v. Littlepage*, 1st Dist. Hamilton Nos. C-170207 and C-170157, 2018-Ohio-2959, ¶ 15, quoting *Greer*, 66 Ohio St.2d 139, 420 N.E.2d 982, at paragraph two of the syllabus. "The showing of 'particularized need' is a threshold requirement[.]" *State v. Curran*, 2d Dist. Clark No.

2005 CA 21, 2006-Ohio-774, ¶ 10. "A particularized need is established 'when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the [movant] a fair trial.' " *State v. Gillispie*, 2021-Ohio-4157, 181 N.E.3d 614, ¶ 6 (2d Dist.), quoting *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 25, and State *v. Sellards*, 17 Ohio St.3d 169, 173, 478 N.E.2d 781 (1985).

{¶26} Following the showing of particularized need, the trial court "shall examine the grand jury transcript in camera and give to defense counsel those portions of the transcript relevant to the state's witness' testimony at trial, subject to the trial court's deletion of extraneous matter[.]" *State v. Horger*, 170 Ohio App.3d 383, 2007-Ohio-665, 867 N.E.2d 466, ¶ 11 (5th Dist.). And "[t]he decision whether to release grand jury testimony is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *O'Leary*, 12th Dist. Butler No. CA2013-01-009, 2013-Ohio-5670, at ¶ 30, citing *State v. Coley*, 93 Ohio St.3d 253, 261, 754 N.E.2d 1129 (2001).

{¶27} Mr. Gibson maintains that he demonstrated particularized need for Mr. Castille's grand jury testimony because of evidence indicating that he had motive to fabricate Mr. Gibson's involvement in the shooting to secure his own release from a mandated rehabilitation program. However, defense had—and took—the opportunity to question Mr. Castille about the alleged inconsistencies in his testimony and his potential motive to lie. Moreover, while the trial court did not find that the defense demonstrated sufficient particularized need for the grand jury transcript, it did conclude that the defense advanced sufficient particularized need to know the exact date of Mr. Castille's testimony before the grand jury in order to advance the defense's

argument that this date may have coincided with his release from the mandated rehabilitation program. Armed with that knowledge, counsel utilized the opportunity to attack Mr. Castille's credibility during closing argument.

{¶28} The trial court was well aware of Mr. Castille's potential motive to lie, so we cannot conclude that Mr. Gibson established particularized need by explaining that he needed the grand jury testimony to *further* poke holes in Mr. Castille's credibility. On this record, Mr. Gibson was not denied a "fair trial" in the absence of this grand jury testimony, *see Gillispie*, 2021-Ohio-4157, 181 N.E.3d 614, at ¶ 6, so the trial court did not abuse its discretion in this instance when it refused to conduct an in camera review or order disclosure of the testimony.

{¶29} In a similar vein, Mr. Gibson contends that he demonstrated particularized need for Mr. Gunn's grand jury testimony because stricken testimony at trial hinted that he had relayed a story to the grand jury of a purported "apology" by Mr. Gibson for the murder. Because the disputed statement arose in a "situation that's not discoverable," according to the state, the trial court struck those portions of Mr. Gunn's testimony relating to the alleged apology. Defense counsel (and now Mr. Gibson, on appeal) speculated that Mr. Gunn shared the "apology" story while testifying before the grand jury. According to Mr. Gibson, the record establishes that the "apology" could not have occurred given his incarceration at the time he purportedly delivered it—and thus, pulling that card out causes the whole house supporting the indictment to collapse. Also, Mr. Gibson notes, Mr. Gunn had a motive to lie in light of his arrest on a number of felony drug charges shortly after his daughter's shooting. Again, Mr. Gibson maintains that, at minimum, these circumstances required the trial court to conduct an in camera review of the testimony.

{¶30} Nevertheless, the trial court considered the potential weaknesses and inconsistences in Mr. Gunn's testimony with respect to the purported apology. Trial counsel presented a certified copy of the record of Mr. Gibson's incarceration during the time period in which Mr. Gunn claimed the apology occurred. And because all statements at trial regarding this alleged apology were stricken from the record, they did not bear on Mr. Gibson's ultimate convictions. Moreover, defense counsel thoroughly cross-examined Mr. Gunn on his motive to lie due to his felony drug charges, and the trial court understood that Mr. Gunn was the victim's father and a relative of Mr. Daniels. Because defense counsel fully explored Mr. Gunn's potential biases, motive to lie at trial, and the inconsistencies in his testimony—and these were the exact reasons counsel sought Mr. Gunn's grand jury testimony—the trial court did not abuse its discretion when it determined that Mr. Gibson failed to establish sufficient particularized need for an in camera review or disclosure of said testimony.

{¶31} Accordingly, we overrule Mr. Gibson's second assignment of error.

IV.

{¶32} In his third assignment of error, Mr. Gibson argues that the trial court erred in denying defense counsel's request to admit the grand jury testimony of Mr. Castille and Mr. Gunn under seal as a court exhibit for purposes of appeal.

{¶33} Under Evid.R. 103(A)(2), a party is entitled to make an offer of proof, or a "proffer," of evidence when a court excludes the evidence. "The purpose of a proffer is to assist the reviewing court in determining, pursuant to Evid.R. 103, whether the trial court's exclusion of evidence affected a substantial right of the appellant." *In re Walker*, 162 Ohio App.3d 303, 2005-Ohio-3773, 833 N.E.2d 362, ¶ 37.

13

**{¶34}** The trial court here ruled that a proffer of Mr. Gunn's and Mr. Castille's grand jury testimonies was not warranted because the defense had not met the standard for the court to conduct an in camera review.

**{¶35}** While appellate courts recognize that it is generally error for a trial court to deny a defendant's request to proffer evidence for purposes of appellate review, *see State v. Williams*, 4th Dist. Scioto No. 11CA3408, 2012-Ohio-4693, ¶ 65, fn. 6, and *State v. Lominack*, 5th Dist. Stark No. 2012CA00213, 2013-Ohio-2678, ¶ 77-79, here, the stated purpose of the proffer was to help this court determine whether the trial court erred in refusing to order disclosure of the grand jury testimony. As explained in the foregoing assignments of error, based on the record at hand, we have sufficient information to conclude that the trial court did not err in this respect. Review of the grand jury testimony, on this record, would not inform our determination of whether the defendant established particularized need under Crim.R. 6(E), and therefore would not assist this court in "determining * * * whether the trial court's exclusion of [the grand jury testimonies] affected a substantial right of the appellant." *See In re Walker* at ¶ 37; *see also State v. Brown*, 6th Dist. Lucas No. L-82-297, 1983 Ohio App. LEXIS 11972 (Sept. 16, 1983) (determining that defendant did not demonstrate the requisite particularized need based on the information that defense counsel had access to at trial and not on the contents of the testimony itself).

**{¶36}** Therefore, we overrule the third assignment of error.

V.

**{¶37}** In his fourth assignment of error, Mr. Gibson argues that his convictions for purposeful murder, felony murder, felonious assault, and having weapons while under disability were not supported by legally sufficient evidence and are therefore

contrary to law. He also argues that his convictions were against the manifest weight of the evidence. We address the two claims together for convenience's sake.

**{¶38}** To determine the sufficiency of the evidence to support a criminal conviction, we consider whether, after viewing the evidence in the light most favorable to the state, any reasonable trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We review sufficiency determinations de novo, *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 15, and we must not weigh the evidence. *MacDonald* at ¶ 12. When the evidence is subject to more than one possible interpretation, we must adopt the interpretation consistent with the trial court's judgment. *In re J.C.*, 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 20.

**{¶39}** With respect to a manifest weight of the evidence challenge, we must consider whether the state "carried its burden of persuasion" before the trial court. *State v. Messenger*, Slip Opinion No. 2022-Ohio-4562, ¶ 26; *see State v. Martin*, Slip Opinion No. 2022-Ohio-4175, ¶ 26. Unlike the burden of production, which concerns a party's duty to introduce *enough* evidence on an issue, the burden of persuasion represents a party's duty to convince the factfinder to view the facts in his or her favor. *Messenger* at ¶ 17. Therefore, in order for us to conclude that the factfinder's adjudication of conflicting evidence ran counter to the manifest weight of the evidence—which we reserve for only the most exceptional circumstances—we must find that the factfinder disregarded or overlooked compelling evidence that weighed

15

against conviction. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 388, 678 N.E.2d 541 (1997). We accordingly sit as a "thirteenth juror" in this respect. *Id.*

{¶40} Mr. Gibson begins by attacking the credibility of Mr. Castille, who, according to Mr. Gibson, served as a "source of information" for the Cincinnati police and secured release from his mandated treatment program in exchange for his cooperation and testimony. Mr. Gibson also draws connections between Mr. Castille and Mr. Daniels. However, as discussed earlier, Mr. Castille's potential motive to lie and bias toward Mr. Daniels was presented at trial in cross-examination on all of these topics, with defense counsel characterizing this testimony as dishonest. The trial court had the opportunity to learn Mr. Castille's potential bias and motive to lie, and it sat in the best position to assess the credibility of Mr. Castille and the other witnesses with the benefit of this perspective.

{¶41} Mr. Gibson proceeds to attempt to discredit Mr. Gunn—the father of victim Ms. Williams—also allegedly a "source of information" for police. He seizes on various inconsistencies in Mr. Gunn's testimony, as well as suspicious circumstances under which he stepped forward with his story implicating Mr. Gibson. Again, however, defense counsel peppered Mr. Gunn on cross-examined on these matters. And the trial court knew of his relationship to the victim and to Mr. Daniels.

{¶42} Finally, Mr. Gibson calls into question the testimony of his co-defendant, Mr. Daniels. Mr. Daniels's testimony was the only evidence placing Mr. Gibson at the scene of the shooting of Ms. Williams in the Avalanche. And Mr. Daniels possessed a clear motive to shift the blame of killing his cousin to Mr. Gibson. Mr. Daniels was also told during a police interview that the charges against him might be lessened, and he acknowledged that, to some extent, he was under the impression that

it depended on how the state felt about his testimony. But just as trial counsel had the opportunity to ably cross-examine Mr. Gunn and Mr. Castille on their potential biases and motives to lie, so too did counsel highlight these considerations with respect to Mr. Daniels.

{¶43} While Mr. Castille, Mr. Gunn, and Mr. Daniels certainly possessed varying biases and motives to fabricate their testimonies, and do not appear to be model witnesses, we cannot say that no rational trier of fact would have found the essential elements of Mr. Gibson's offenses beyond a reasonable doubt. Three witnesses, with somewhat consistent narratives, placed Mr. Gibson in the car before or during the shooting. And police found casings from two guns at the scene of the crime, suggesting the involvement of two perpetrators. While we appreciate that these convictions stem from witnesses of varying credibility and without physical evidence implicating Mr. Gibson, this is not the exceptional case in which the evidence weighs heavily against the convictions. Despite the unreliability of Mr. Castille, Mr. Gunn, and Mr. Daniels, Ohio law is clear that " '[an adjudication] is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony.' " *In re A.K.*, 1st Dist. Hamilton No. C-210178, 2021-Ohio-4199, ¶ 26, quoting *State v. Robinson*, 12th Dist. Butler No. CA2018-08-163, 2019-Ohio-3144, ¶ 29.

{¶44} Accordingly, we overrule Mr. Gibson's fourth assignment of error.

VI.

{¶45} In his fifth and final assignment of error, Mr. Gibson insists that the trial court erred in sentencing him. According to Mr. Gibson, the trial court imposed a

sentence that was contrary to law when it ordered him to serve a consecutive term on the five-year firearm specification attached to count 12, the felonious assault charge pertaining to Mr. Cooper. The state agrees that Mr. Gibson's sentence should be reduced by five years for an aggregate sentence of 32 years to life.

{¶46} Counts 8 and 12 were accompanied by three firearm specifications each: a five-year drive-by specification under R.C. 2941.146(A); a one-year possession specification under R.C. 2941.141(A); and a three-year facilitation specification under R.C. 2941.145(A). For each count, the court merged the one-year possession specification with the three-year facilitation specification. The court then imposed consecutive terms on all the five-year drive-by and three-year facilitation specifications for a grand total of 16 additional years of imprisonment on specifications alone. Defense counsel objected to the sentences on the firearm specifications as contrary to law.

{¶47} R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, modify, or vacate and remand a challenged felony sentence if the sentence is "clearly and convincingly unsupported by the record or otherwise contrary to law." *State v. Freeman*, 1st Dist. Hamilton No. C-190090, 2018-Ohio-4973, ¶ 6.

{¶48} Here, although both R.C. 2929.14(B)(1)(a) and (b) contain language stating that a trial court may only impose prison terms for one five-year specification and one three-year specification if there are multiple offenses committed in a single criminal transaction, R.C. 2929.14(B)(1)(g) provides an exception stating that if one of the offenses is a murder or felonious assault, the trial court is required to impose prison terms for the two most serious specifications. *See State v. Sheffey*, 8th Dist.

Cuyahoga No. 98944, 2013-Ohio-2463, ¶ 28; *State v. Howard*, 2d Dist. Montgomery No. 28314, 2020-Ohio-3819, ¶ 91-97.

**{¶49}** Therefore, for count 8, for purposeful murder, the trial court was correct to impose consecutive terms on both the five-year drive-by and three-year facilitation specifications. For count 12, however, for felonious assault pertaining to Mr. Cooper, the consecutive term on the three-year facilitation specification was proper whereas the consecutive term on the five-year drive-by specification was not. Mr. Gibson's aggregate sentence of 37 years to life should be reduced by five years for an aggregate term of 32 years to life.

**{¶50}** We therefore sustain Mr. Gibson's fifth assignment of error.

\*     \*     \*

**{¶51}** In light of the foregoing analysis, we overrule Mr. Gibson's first four assignments of error. But we sustain his fifth assignment of error, reversing the trial court's judgment in part and remanding the cause for the limited purpose of reducing Mr. Gibson's aggregate sentence in compliance with R.C. 2929.14(B)(1)(a),(b), and (g). The trial court's judgment is affirmed in all other respects.

Judgment affirmed in part, reversed in part, and cause remanded.

**ZAYAS, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.