[Cite as *State v. Lemaine*, 2026-Ohio-1741.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                          :          APPEAL NO.   C-250633
                                                   TRIAL NO.    B-2404313
     Plaintiff-Appellee,           :

  vs.                                   :
                                                             *JUDGMENT ENTRY*
ERNEST LEMAINE,                         :

     Defendant-Appellant.          :


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 5/13/2026 per order of the court.**


**By:**_____
      **Administrative Judge**

[Cite as *State v. Lemaine*, 2026-Ohio-1741.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-250633 |
| | | TRIAL NO. B-2404313 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| ERNEST LEMAINE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 13, 2026

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Fox & Scott, P.L.L.C.*, and *Bradley W. Fox*, for Defendant-Appellant.

**CROUSE, Presiding Judge.**

{¶1} Victim K.B. testified that she was at a friend's home when two men pulled up and one shot through the wall. She identified the shooter as defendant-appellant Ernest Lemaine, with whom she had two children and was embroiled in a custody dispute. Lemaine protested that he had nothing to do with the shooting and had been at work. After a bench trial, the trial court credited K.B., found Lemaine guilty, and sentenced him to prison for felonious assault and three firearm specifications.

{¶2} Lemaine now contends (1) that there was insufficient evidence to convict him, (2) that his convictions were contrary to the manifest weight of the evidence, (3) that his trial counsel was unconstitutionally ineffective, (4) that the State's closing arguments improperly relied upon evidence not admitted at trial, and (5) that his sentences were contrary to law. After reviewing the record and concluding that none of his contentions warrant reversal, we affirm.

## I. BACKGROUND

### A. *Before the Shooting*

{¶3} Lemaine and victim K.B. had two children together and, prior to 2024, had been Florida residents. At some time prior to April 2024, the couple separated and initiated custody proceedings in the Florida courts. The court awarded Lemaine custody of their children and awarded K.B. a right of visitation. The court also imposed upon K.B. an obligation to pay Lemaine child support. Lemaine then moved to the Cincinnati area with his children to manage an apartment complex on Kentucky Avenue for his employer, a property-management company. K.B. followed Lemaine to Cincinnati in April 2024 to remain near her children, bringing her third child (who was not Lemaine's) with her.

{¶4} K.B. and her daughter lived with Lemaine for a time at the apartment complex. However, K.B. had moved out "several days before" September 6, 2024, the date charged in the indictment.

{¶5} Around September 3, 2024, Lemaine and K.B. attended a Zoom hearing with the Florida court that had retained jurisdiction over their child-custody matter. K.B. apparently requested either joint custody or equal parenting time, to which Lemaine would not consent.

### B. The Shooting

{¶6} On the afternoon of September 6, K.B. was visiting a new friend, R.W., at R.W.'s "brother's girlfriend's house" on Washburn Street in Cincinnati. Several other people were present in the home, including C.W., whom K.B. described as "basically the owner of the house." According to testimony elicited at trial, the Washburn house was not far from the Kentucky Avenue apartment complex where Lemaine lived and worked—roughly a quarter mile, or a five-minute walk.

{¶7} K.B. testified that, when she exited the Washburn house to go to her car parked on the street outside, she saw Lemaine's blue Dodge Ram truck "driving past [her] car like very slowly." Although K.B. could not see the driver through the truck's tinted windows, she testified that she recognized the truck as Lemaine's.

{¶8} K.B. testified that, upon seeing the truck, she went back inside the Washburn house for 10 to 15 minutes to avoid encountering Lemaine. When she ventured back outside, she again saw Lemaine's truck—this time parked on the street around the corner—and again ducked into the house. At this point, K.B. gave her keys to her friend, R.W., who volunteered to go out to her car. K.B. testified that when R.W. returned, he seemed "in a panic as if something like happened."

{¶9} K.B. estimated that another 30 minutes passed inside the Washburn

house before she heard a knock at the door. R.W., his brother, and C.W. went to answer it. K.B. testified that when her companions opened the door, she could see a man in a white shirt standing in the doorway and a white Ford Fusion parked in front of the house. K.B. identified the white-shirted man as "Marcus," and said that he "live[d] with Ernest Lemaine." K.B. heard Marcus twice ask those at the door if K.B. could step outside, and heard R.W. twice reply that K.B. could not. After the second denial, Marcus headed back toward his car.

{¶10} As Marcus approached his vehicle, K.B. said, she saw him "fumbl[e] with" and nearly drop a weapon. K.B. testified that, at roughly the same time, she saw Lemaine roll down the white Ford's passenger-side window and point a gun at the Washburn house. A "second later" K.B. heard a gunshot, after which Marcus got into the car and the two men drove off.

### C. Police Response

{¶11} C.W. called 9-1-1. In her call, a recording of which was admitted at trial, C.W. told the dispatcher that "some girl's boyfriend came over here and shot at [C.W.'s] house." Eventually, C.W. handed the phone to K.B., who identified the shooter as Lemaine.

{¶12} Cincinnati Police Officers Freeman and Ward received the shots-fired call around 4:55 p.m. and were the first officers to arrive at the scene a few minutes later. Officer Ward saw what he described as a "bullet hole" going through an exterior wall and into the living room of the house. Those present at the house also informed Officer Freeman about the white Ford and blue truck, leading Officer Freeman to radio his fellow officers to be on the lookout for a white Ford.

{¶13} Within half an hour, officers had stopped a white Ford Fusion roughly a half mile from Lemaine's Kentucky Avenue apartment complex. That vehicle

contained Marcus and another, unidentified passenger, but not Lemaine. Police interviewed Marcus but did not arrest him or his passenger.

{¶14} Another Cincinnati police officer, Officer Croswell, recognized Lemaine's name over the radio and drove to the Kentucky Avenue apartment complex to speak with him. According to the timestamps on the body-worn camera ("BWC") footage, officers arrived at the Kentucky Avenue complex roughly an hour after the initial shots-fired call. When the officers asked Lemaine about the shooting, Lemaine replied that he had nothing to do with any shots fired, that he had been working at his apartment complex at the relevant time, that he had been about to go out for food with his children when the officers arrived, and that K.B. had made false criminal complaints against him in the past. Officers drove Lemaine to K.B., who identified him. They then placed Lemaine under arrest.

### D. Indictment & Trial

{¶15} The Hamilton County Grand Jury returned a four-count indictment against Lemaine. Count 1 charged Lemaine with discharging a firearm at or into an occupied structure in violation of R.C. 2923.161(A)(1). Counts 2, 3, and 4 charged him with the felonious assault of K.B., C.W., and R.W., respectively, in violation of R.C. 2903.11(A)(2). Each count included three firearm specifications, which charged that Lemaine had (1) possessed a firearm while committing the offense, (2) used a firearm to facilitate the commission of the offense, and (3) committed the offense by discharging a firearm from a motor vehicle. For ease, we shall refer to the first specification to Count 1 as "Spec 1.1," the first specification to Count 2 as "Spec 2.1," and so on.

{¶16} During the two-day bench trial, the State called K.B., as well as Officers Freeman, Ward, and Croswell, to testify. Through these witnesses, it introduced the 9-

6

1-1 call recording, BWC footage from Officers Freeman and Ward, footage of Lemaine's discussion with the officers captured by an in-cruiser camera, photos taken at the Washburn house, and screenshots from other BWC footage. The defense called Lemaine to testify on his own behalf.

{¶17} The court found Lemaine guilty on Counts 1 and 2 (improper discharge into a habitation and felonious assault of K.B.) and all six of their attendant specifications, but found Lemaine not guilty on Counts 3 and 4 (felonious assault of C.W. and R.W.). The trial court merged Count 1 into Count 2 and merged three of the specifications into the other three, so that Lemaine was only sentenced on Count 2 and Specs 1.2, 2.2, and 2.3. It ran all four sentences consecutively, for an aggregate prison term of 16 years to 18 years, 6 months.

## II. SUFFICIENCY & WEIGHT OF THE EVIDENCE

{¶18} Lemaine's first two assignments of error challenge the sufficiency and weight of the evidence used to convict him of Counts 1 and 2.[1]

{¶19} To prove the allegations in Count 1 of its indictment charging a violation of R.C. 2923.161(A)(1), the State had to show (1) that Lemaine "knowingly discharged a firearm," (2) that he fired "at or into an occupied structure," and (3) that said structure was the "permanent or temporary habitation of [C.W.]."

{¶20} And to prove the allegations in Count 2 that could support a conviction under R.C. 2903.11(A)(2), the State had to show that Lemaine had (1) "knowingly

---

[1] Ordinarily, a defendant's challenge to his conviction on a merged count is moot, as no sentence has been imposed on that count. *See State v. Myers*, 2018-Ohio-1903, ¶ 138; *State v. Garrett*, 2026-Ohio-49, ¶ 17 (1st Dist.). But while the court below merged Count 1 into Count 2, it still imposed a sentence on Spec 1.2. The validity of Lemaine's sentence on Spec 1.2—indeed, the trial court's ability to impose sentences for more than one firearm-facilitation specification—hinged on Lemaine's guilt on the improper-discharge charge in Count 1. (For a fuller explanation of why this is so, see our discussion of Lemaine's fifth assignment of error in Part IV.) Thus, his challenge to the finding of guilt on Count 1 is not moot.

caused, or attempted to cause, physical harm to [K.B.]," and (2) that he did so "by means of a deadly weapon or dangerous ordnance, to wit: A FIREARM." Because the State never sought to prove actual harm under the first element, we focus on its evidence that Lemaine "knowingly . . . attempted to cause" K.B. physical harm.

**{¶21}** Lemaine does not appear to challenge the sufficiency or weight of the evidence supporting his convictions on the various specifications, beyond challenging factual findings that underpinned his findings of guilt for the underlying felonies.

### A. Sufficiency

**{¶22}** Lemaine's first assignment of error challenges the sufficiency of the evidence. This is, in essence, an allegation that the State failed to meet its burden of production. *See State v. Messenger*, 2022-Ohio-4562, ¶ 26; *State v. Chambers*, 2025-Ohio-4737, ¶ 18 (1st Dist.). To determine whether the State's evidence was sufficient to sustain a conviction, we ask whether that evidence, if believed and taken in the light most favorable to the State, could have satisfied all the elements the State had to prove at trial. *See State v. Jones*, 2021-Ohio-3311, ¶ 16; *Chambers* at ¶ 18.

**{¶23}** In this case, K.B.'s testimony was clearly sufficient to convict Lemaine on both Counts 1 and 2.

**{¶24}** *First,* K.B. testified that the Washburn house was C.W.'s home.

**{¶25}** *Second*, K.B.'s and Lemaine's testimony could clearly support a finding that Lemaine knew or believed that K.B. was inside the Washburn house. According to K.B., Lemaine had been parked outside the Washburn house earlier, when K.B. had gone outside to her car, so Lemaine could easily have seen her. K.B. also testified that Lemaine was in the car with Marcus, when Marcus went up to the Washburn house door and asked that K.B. come outside.

**{¶26}** *Third*, the testimony of K.B. and Officer Ward was sufficient to support

a finding that Lemaine discharged a firearm into the Washburn home. K.B. testified that, just before she heard a shot ring out, she saw Lemaine roll down the window of the Ford Fusion, pull out a gun, and point it toward the building. And Officer Ward testified about and authenticated photographs of an apparent bullet hole in the Washburn house's wall.

{¶27} This evidence, if believed, satisfied the State's burden of production on nearly every element of Counts 1 and 2; only one further inference was required. To find guilt on the felonious-assault charge, the trial court needed to find that Lemaine's gunshot constituted a knowing attempt to strike K.B., rather than merely to threaten or scare her. But such an inference would clearly be permissible if the factfinder accepted the testimony regarding the couple's past and present custodial disputes, Lemaine's repeated appearances outside the house earlier that day, and Marcus's ominous request that K.B. come outside.

{¶28} Accordingly, we hold that the evidence was sufficient to support findings of guilt on the charges of improper discharge into C.W.'s habitation and felonious assault of K.B. Lemaine's first assignment of error is overruled.

### B. Manifest Weight

{¶29} Unlike a sufficiency challenge, a manifest-weight challenge concerns the burden of *persuasion*, rather than *production*. *See Messenger*, 2022-Ohio-4562, at ¶ 26; *State v. Gibson*, 2023-Ohio-1154, ¶ 39 (1st Dist.). We must review the record, then weigh the evidence and all reasonable inferences to assure ourselves that the factfinder—whether judge or jury—did not clearly lose its way in finding guilt beyond a reasonable doubt. *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983); *State v. Thompkins*, 1997-Ohio-52, ¶ 25. This necessarily entails consideration of the witnesses' credibility, where such assessments can be made from a cold record. *State*

9

*v. Garrett*, 2026-Ohio-49, ¶ 69 (1st Dist.), citing *Thompkins* at ¶ 25. However, because we did not observe the witnesses firsthand, we defer to the factfinder's credibility judgments in all but those "'most exceptional circumstances,' when the factfinder 'disregarded or overlooked compelling evidence' that contradicted its findings." *Garrett* at ¶ 69, quoting *Gibson* at ¶ 39; *see State v. Railey*, 2012-Ohio-4233, ¶ 14 (1st Dist.). If, after review, we conclude that the trial court lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice, then we must reverse its judgment and order a new trial. *Martin* at 175; *Thompkins* at ¶ 25.

**{¶30}** The core point of contention at Lemaine's trial was the shooter's identity. Defense counsel conceded in closing arguments that "shots were fired at the house" and that "[s]omebody fired the shots." The question was whether Lemaine was that "somebody." The trial court found he was. After reviewing the entire record, we cannot say it lost its way in doing so.

**{¶31}** As the trial court aptly noted before making its on-the-record findings: "[T]his is a case that involves a he said-she said circumstance." K.B. said she saw Lemaine with a gun in the white Ford Fusion. Lemaine said that he was at the apartment complex with his kids. No witnesses provided corroboration for either account.

**{¶32}** Below and in this court, Lemaine points to gaps in the State's narrative and reasons to question K.B.'s testimony.

**{¶33}** *First*, Lemaine questions K.B.'s narrative that she saw Lemaine drive by the Washburn house in his blue truck, then come back and sit outside the house in the same vehicle, only to return 30 minutes later as a passenger in Marcus's white Ford Fusion. Lemaine points out that K.B. testified that Lemaine had fled the Washburn house with Marcus in Marcus's car. Yet, when Marcus was pulled over less than 20 to

30 minutes later, Lemaine was not in the vehicle. Rather, a *different*, unidentified person was in the passenger seat.

**{¶34}** K.B.'s narrative is certainly not impossible or even implausible. The Washburn house, Lemaine's apartment complex, and the spot where Marcus was pulled over were all within one mile of each other. The 20- and 30-minute gaps between vehicle sightings would have provided time to switch cars or passengers in each instance.

**{¶35}** *Second,* Lemaine notes that K.B. never said she *saw* Lemaine fire the shot from the car; she merely *heard* a shot from *someone's* gun. Thus, Lemaine argues, it is at least possible the shot came from the weapon Marcus was fumbling with. However, if the trial court credited the rest of K.B.'s testimony, it could easily infer that the gunshot came from the man who K.B. said had lowered his window just seconds prior to point his gun at the house (i.e., Lemaine)—and not from the fumbling man walking away from the building (i.e., Marcus).

**{¶36}** *Third,* Lemaine argues that there was no evidence that he ever owned or possessed a firearm. But this is somewhat misleading. It is true that K.B. testified multiple times that she never *saw* Lemaine with a gun. But K.B. also testified that Lemaine had *told her* he owned a gun and that he used it as part of his job.

**{¶37}** *Fourth*, Lemaine contends that what is *not* in evidence should have created reasonable doubt. He notes that, although K.B. named several individuals who were present in the Washburn house during the shooting—at least one of whom (R.W.) allegedly went out to interact with Lemaine—the State's only eyewitness was K.B., with whom Lemaine was in a custody battle. Lemaine further notes that the officers never interviewed his daughters about his whereabouts during the shooting or investigated the mystery passenger in Marcus's car. And he points out that, despite K.B.'s testimony

that both Marcus and Lemaine had guns at the Washburn house, the officers never found a weapon—even after accosting Marcus and Lemaine in their respective vehicles within an hour of the shooting. These glaring omissions, Lemaine contends, warrant reversal.

{¶38} But even after considering all these omissions, as well as Lemaine's testimony regarding K.B.'s alleged motive and prior accusations against him, we cannot conclude that Lemaine's convictions were against the manifest weight of the evidence. K.B. said she heard a shot ring out right after seeing Lemaine roll down his window and point a gun at the Washburn house. The trial court "had the opportunity to learn [K.B.'s] potential bias and motive to lie, and it sat in the best position to assess [her] credibility." *See Gibson*, 2023-Ohio-1154, at ¶ 40 (1st Dist.). After doing so, it found her credible.

{¶39} Nor has Lemaine pointed to the sort of truly "compelling evidence" necessary for us to disregard such a credibility finding. *See id.* at ¶ 39. Lemaine's evidence provided some reason to doubt K.B., but it did not *require* the trial court to disbelieve her. And even in a he-said-she-said case like this one, the law is clear: "an adjudication is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." (Cleaned up.) *Id.* at ¶ 43.

{¶40} We therefore hold that the trial court did not lose its way in finding Lemaine guilty of improperly discharging a firearm into C.W.'s dwelling and of the felonious assault of K.B. Lemaine's second assignment of error is overruled.

### III. Trial Rights

{¶41} Lemaine's next two assignments of error concern his right to due process and a fair trial. In his third assignment of error, he contends that he was denied the effective assistance of counsel. In his fourth, he contends that the prosecutor

engaged in misconduct by relying upon facts not in evidence in his closing argument.

### A. Ineffective Assistance of Counsel

**{¶42}** A criminal defendant has a right to the effective assistance of counsel, both under the Sixth Amendment to the United States Constitution and under Article I, Section 10, of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989). A conviction will be reversed based upon trial counsel's ineffectiveness where (1) "counsel's performance was deficient," and (2) that "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Conway*, 2006-Ohio-2815, ¶ 95, citing *Strickland* at 687.

**{¶43}** Lemaine argues that his trial counsel was ineffective for failing to introduce (1) alibi evidence, (2) evidence of the dismissed criminal allegations K.B. had allegedly filed against Lemaine, and (3) evidence of the alleged civil judgments Lemaine received against K.B. for filing false reports or allegations.

**{¶44}** In general, it is "incredibly difficult, if not impossible, for a defendant on direct appeal to challenge the effectiveness of her trial counsel under a failure-to-introduce-evidence theory." *State v. Collins*, 2024-Ohio-5112, ¶ 71 (1st Dist.), citing *State v. Bell*, 2023-Ohio-1010, ¶ 9 (1st Dist.). This case is no exception. The record contains none of the allegedly exculpatory materials Lemaine identifies, so we have no way of discerning their relevance or weight. *See id.* at ¶ 74.

**{¶45}** Lemaine also argues that trial counsel was ineffective for failing to file a notice of alibi. This theory fails for essentially the same reason as his failure-to-introduce-evidence claims. To rule for Lemaine, we would need to hold that an objectively reasonable attorney would necessarily have filed an alibi notice, and that, had they done so, there would have been a "reasonable probability" of a different

outcome. *See Strickland*, 466 U.S. at 687-688, 694. Both determinations turn on the existence and quality of Lemaine's alleged alibi evidence—evidence the record does not contain.

**{¶46}** In a he-said-she-said case like this one, where physical evidence was lacking and the case turned almost entirely on credibility determinations, evidence of an alibi or evidence that the State's main witness told similar false stories in the past could make a difference. But no such evidence is in the record. Thus, Lemaine's *Strickland* claims are "better suited for proceedings where that evidence can be introduced, such as a petition for postconviction relief under R.C. 2953.21 or a motion for a new trial under Crim.R. 33." *See Collins* at ¶ 73.

**{¶47}** Lemaine's third assignment of error is overruled.

### B.  Prosecutorial Misconduct

**{¶48}** In his fourth assignment of error, Lemaine contends that the prosecuting attorney acted improperly by "rel[ying] upon evidence not admitted at trial during closing argument." "When reviewing a claim of prosecutorial misconduct, our inquiry is twofold: we must first decide whether the prosecutor's actions were improper, and if so, we consider whether the conduct prejudicially affected the defendant's substantial rights." *State v. Kirkland*, 2020-Ohio-4079, ¶ 115. We assess the prejudice component with respect to "'the fairness of the trial, not the culpability of the prosecutor.'" *Id.*, quoting *Smith v. Phillips*, 455 U.S. 290, 219 (1982).

**{¶49}** In this case, Lemaine did not object to any portion of the State's closing argument or rebuttal. He has thus waived all but plain error. *See* Crim.R. 52(B); *State v. McAlpin*, 2022-Ohio-1567, ¶ 228.

**{¶50}** It is obviously improper for a prosecutor to urge a finder of fact to rely upon testimony never adduced at trial—or to rely upon out-of-court statements for

their truth when not admitted for that purpose. *See State v. Lott*, 51 Ohio St.3d 160, 166 (1990) (finding prosecutorial misconduct where prosecutor, in closing, "improperly injected hearsay statements" that were not admitted for their truth). But in his brief, Lemaine neither cited nor quoted any allegedly improper statements from the prosecuting attorney's closing argument or rebuttal. Instead, he referred generally to the prosecuting attorney's "multiple statements about what other alleged witnesses saw or said."

{¶51} As best we can tell, this is a reference to C.W.'s comments on the 9-1-1-call recording that "some girl's boyfriend" had shot at her Washburn home. In his closing argument, the prosecuting attorney told the court, "You have the contents of that call, where it's very clear who everyone in that home is pointing the finger at and they're pointing it at Mr. Lemaine."

{¶52} The 9-1-1 call that included C.W.'s statements was admitted into evidence, seemingly under the excited-utterance exception to the rule against hearsay. Lemaine has not appealed that evidentiary decision, so we assume its propriety. Thus, the prosecutor was permitted to rely upon C.W.'s statement for the truth of what it asserted—i.e., to prove that "some girl's boyfriend" had shot at C.W.'s home. However, the prosecutor's comment that "*everyone* in the home" pointed the finger at Lemaine did go beyond the evidence admitted at trial. Only C.W. and K.B. spoke on the call. Thus, to the extent the prosecutor suggested that anyone else in the Washburn house had accused Lemaine, his statement was improper.

{¶53} Even so, Lemaine has failed to show that this comment deprived him of a fair trial. We presume that, when a trial court presides over a trial without a jury, it considers only relevant, material evidence in reaching its decision. *State v. Rouzier*, 2021-Ohio-1466, ¶ 19 (1st Dist.), citing *State v. White*, 15 Ohio St.2d 146, 151 (1968).

Here, the trial court expressly said it relied on K.B.'s statements, which *were* in evidence, to reach its conclusions. Thus, Lemaine has not rebutted—let alone *plainly* rebutted—the presumption that the trial court relied upon legitimate evidence. *Compare id.*

**{¶54}** Finding no plain error, we overrule Lemaine's fourth assignment of error.

## IV. SENTENCES

**{¶55}** In his fifth and final assignment of error, Lemaine contends that his sentence was not permitted by law. We have jurisdiction to review whether a sentence is contrary to law pursuant to R.C. 2953.08(A)(4).

**{¶56}** As discussed above, Lemaine was found guilty of Counts 1 and 2 in the indictment, along with six firearm specifications. When the trial court sentenced Lemaine, it merged Count 1 into Count 2, and imposed an indefinite term of between five years and seven years and six months for Count 2. Lemaine does not challenge the trial court's determination to merge Count 1 into Count 2. Thus, we consider only the firearm specifications.

**{¶57}** Lemaine argues that he was sentenced for one too many firearm specifications. Specifically, he argues that "R.C. 2929.14(B)(1)(g) requires consecutive sentences be imposed for the two most serious specifications only," and that "a sentencing Court cannot impose a consecutive sentence for additional firearm specifications beyond the two most serious" under the Ohio Supreme Court's decisions in *State v. Bollar*, 2022-Ohio-4370, and *State v. Beatty*, 2024-Ohio-5684.

**{¶58}** For each of Counts 1 and 2, Lemaine was charged with three separate firearm specifications: (1) a "possession spec," R.C. 2941.141, (2) a "facilitation spec," R.C. 2941.145, and (3) a "vehicle-discharge spec," R.C. 2941.146(A).

16

**{¶59}** The corresponding sentences for these specifications were prescribed by R.C. 2929.14(B). Division (B)(1)(a)(iii) prescribed one-year prison terms for the possession specs; division (B)(1)(a)(ii) prescribed three-year terms for the facilitation specs; and division (B)(1)(c)(i) prescribed five-year terms for the vehicle-discharge specs.

**{¶60}** The trial court then merged the possession specs into the respective facilitation specs, and merged the vehicle-discharge spec on Count 1 into its counterpart under Count 2. This left the two facilitation specs and one vehicle-discharge spec, for a total of 11 years on the gun specifications. The trial court ran all sentences consecutively, for a total sentence of 16 years to 18 years and 6 months. A table summarizing the charges and sentences is below.

| | Description | Statutes | Sentence |
|---|---|---|---|
| Count 1 | Improper Discharge into a Habitation | R.C. 2923.161(A)(1) | *merged with Count 2* |
| Spec 1.1 | Possession Spec | R.C. 2941.141, R.C. 2929.14(B)(1)(a)(iii) | *merged with Spec 1.2* |
| Spec 1.2 | Facilitation Spec | R.C. 2941.145, R.C. 2929.14(B)(1)(a)(ii) | 3 years (consecutive) |
| Spec 1.3 | Vehicle-Discharge Spec | R.C. 2941.146, R.C. 2929.14(B)(1)(c)(i) | *merged with Spec 2.3* |
| Count 2 | Felonious Assault | R.C. 2903.11(A)(2) | 5 to 7.5 years |
| Spec 2.1 | Possession Spec | R.C. 2941.141, R.C. 2929.14(B)(1)(a)(iii) | *merged with Spec 2.2* |
| Spec 2.2 | Facilitation Spec | R.C. 2941.145, R.C. 2929.14(B)(1)(a)(ii) | 3 years (consecutive) |
| Spec 2.3 | Vehicle-Discharge Spec | R.C. 2941.146, R.C. 2929.14(B)(1)(c)(i) | 5 years (consecutive) |
| | | **Aggregate Sentence:** | **16 to 18.5 years** |

**{¶61}** Lemaine contends that because he should have been sentenced for the two most serious specifications only, the trial court was required to impose consecutive sentences for the vehicle-discharge specs to Counts 1 and 2, which totaled

ten years, then merge all remaining specifications.

{¶62} Lemaine's argument collapses two distinct questions, both of which a sentencing court must answer. *First*, the court must determine which charges merge and which remain for sentencing. *Second*, it must consider whether any statute has authorized (or mandated) it to impose consecutive, rather than concurrent, sentences for the unmerged offenses and specifications. When these questions are considered individually, it becomes clear that R.C. 2929.14(B)(1)(g)—the provision on which Lemaine relies—does not apply to vehicle-discharge specs and does not affect a court's ability to impose consecutive sentences.

### *A. Merger*

{¶63} We turn first to the possession and facilitation specs. Specs 1.1 and 2.1 required sentences under R.C. 2929.14(B)(1)(a)(iii), and Specs 1.2 and 2.2 required sentences under division (B)(1)(a)(ii). Because these sentences would be imposed under division (B)(1)(a), and because the underlying felonies were committed "as part of the same act or transaction," R.C. 2929.14(B)(1)(b) would ordinarily permit a sentence for only *one* of these four specifications.

{¶64} But R.C. 2929.14(B)(1)(g) creates an exception to (B)(1)(b). If (1) a defendant is found guilty of two or more felonies, and (2) one of those offenses appears on (B)(1)(g)'s list of serious felonies, then the trial court *must* impose sentences for the *two most serious* (B)(1)(a) specifications. *See* R.C. 2929.14(B)(1)(g). And, as the Ohio Supreme Court made clear in *Bollar*, specifications subject to (B)(1)(g) *survive the merger* of their underlying felonies. *See Bollar*, 2022-Ohio-4370, at ¶ 19. After a trial court has imposed sentences for the two most serious specifications, it has discretion whether to impose sentences for the other (B)(1)(a) specifications. *See* R.C. 2929.14(B)(1)(g).

18

**{¶65}** Lemaine fell within the (B)(1)(g) exception. He was found guilty of two substantive offenses, and one of them (felonious assault) was on the list in (B)(1)(g). Thus, the trial court was obligated to impose sentences for "each of the two most serious [(B)(1)(a)] specifications of which [Lemaine was] convicted." *See* R.C. 2929.14(B)(1)(g). Here, that meant that the trial court was obligated to impose sentences on Specs 1.2 and 2.2, which carried three-year prison terms. The trial court then exercised its discretion by declining to impose sentences for Specs 1.1 and 2.1, which carried one-year terms.

**{¶66}** That left the sentences for the two vehicle-discharge specs (1.3 and 2.3), which were imposed pursuant to R.C. 2929.14(B)(1)(c). These vehicle-discharge specs were not subject to the special merger rules in (B)(1)(b) and (g), as those rules apply only to sentences "impose[d] . . . under division (B)(1)(a)." Thus, the vehicle-discharge specs were subject to ordinary merger principles, absent a clear statutory provision authorizing multiple punishments for the same offense, like (B)(1)(g). *See Bollar* at ¶ 20-21. The trial court properly merged the vehicle-discharge specs along with their underlying felonies, resulting in an additional sentence for only one of the vehicle-discharge specifications.

**{¶67}** Accordingly, we hold that the trial court did not err by imposing sentences on Count 2 and Specs 1.2, 2.2, and 2.3.

### B. Consecutive Sentencing

**{¶68}** Once a sentencing court determines *which* counts and specifications will receive sentences, it then must determine whether those sentences should be served concurrently or consecutively.

**{¶69}** We begin with the presumption that all sentences—including sentences for specifications—are to be served concurrently, absent an express statutory

exception. *See* R.C. 2929.41(A); *Beatty*, 2024-Ohio-5684, at ¶ 11, 15-17.

**{¶70}** R.C. 2929.14(C)(1)(a) sets forth one mandatory exception to this presumption of concurrency. Under that provision, when a defendant receives a mandatory prison term under R.C. 2929.14(B)(1)(a) or (B)(1)(c), the defendant "shall serve" that term "consecutively to any other" prison term imposed for a different (B)(1)(a), (c), or (d) specification; consecutively to any term imposed for the underlying felony; and consecutively to any term imposed "previously or subsequently." R.C. 2929.14(C)(1)(a).

**{¶71}** Because Lemaine's sentences on Specs 1.2, 2.2, and 2.3 were imposed under R.C. 2929.14(B)(1)(a) and (B)(1)(c), Lemaine was required to serve them consecutively to each other and to his sentence on Count 2. *See* R.C. 2929.14(C)(1)(a). The trial court therefore did not act contrary to law by imposing consecutive sentences on Count 2 and Specs 1.2, 2.2, and 2.3.

**{¶72}** Lemaine's fifth assignment of error is overruled.

## V. CONCLUSION

**{¶73}** Having overruled Lemaine's five assignments of error, we affirm the trial court's judgment.

Judgment affirmed.

**NESTOR** and **MOORE, JJ.,** concur.